383 A.2d 808

**AIKEN INDUSTRIES, INC., Appellee,**

v.

**The ESTATE of Thomas A. WILSON, Eugene R. Speer and the Union National Bank of Pittsburgh, Executors, Appellants.**

Supreme Court of Pennsylvania.

Argued Oct. 10, 1974.

Decided Jan. 31, 1978.

Reargument Denied April 11, 1978.

Ralph H. German, Houston, Cooper, Speer & German, Pittsburgh, for appellants.

Walter T. McGough, Roger C. Wiegand, Reed, Smith, Shaw & McClay, Pittsburgh, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION

PER CURIAM.

The Court being equally divided with respect to the question of appellant's liability, the decree below is affirmed.

Each party to bear own costs.

JONES, former C. J., did not participate in the consideration or decision of this case.

Mr. Justice Pomeroy filed an opinion, joined by Mr. Chief Justice Eagen and Mr. Justice O'Brien, which would affirm the decree below insofar as it finds a breach of the covenant not to compete but would vacate the award insofar as it fixes the amount of damages and would remand for the recalculation of damages. Mr. Justice Roberts, Mr. Justice Nix and Mr. Justice Manderino filed separate opinions which

would reverse the decree below on the ground the non-competition agreement was not breached.

POMEROY, Justice, in support of affirmance and modification.

Thomas A. Wilson was the sole shareholder of National Carbide Die Company (National). In 1967, in a tax-free transaction, Wilson caused all the assets of National to be sold to Aiken Industries, Inc. (Aiken) in exchange for $2,000,000 worth of Aiken stock. One of the terms of the sales transaction was that Mr. Wilson would be employed by Aiken and that while so employed would refrain from competition with National. In this action for damages,[1] Aiken alleges a breach of that covenant as well as a breach of a fiduciary duty Wilson owed to Aiken.[2] The chancellor, upheld by a court en banc, found that Wilson did violate both his contractual and fiduciary duties and awarded damages. This is an appeal by the executors of Wilson's estate in which it is asserted that: (1) there was no evidence of breach of the non-competition agreement; (2) Wilson's actions were not in violation of his fiduciary duty; and (3) the measure of damages was improper.[3]

1. As originally filed, the action also sought injunctive relief against continuing competitive activity by Wilson. During the pendency of the action Wilson died, and the executors of his estate were substituted as defendants. Thereafter the claim for injunctive relief was withdrawn.

2. One aspect of the agreements between the parties was that Wilson was to become an executive of Aiken for a term of five years. Upon consummation of the transaction Wilson did become a director of Aiken and President of National, which was made a division of Aiken. The alleged breach of fiduciary duty pertains to Wilson's status as an officer and director of Aiken. For the reasons discussed *infra*, n. 8, n. 9 and accompanying text, we need not reach the propriety of the chancellor's finding that the fiduciary duty was breached.

3. This appeal was brought in this Court pursuant to the Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, No. 223, 17 P.S. § 211.202(4). Since the filing of this appeal, that section of the Act has been suspended absolutely by Rule 5105(a) of the Rules of Appellate Procedure, effective July 1, 1976. Appeals in equity are now governed by Pa. R.A.P. 702(b).

## 1. *Breach of Covenant Not to Compete.*

As an initial matter, it is to be observed that the function of this Court on an appeal from an adjudication in equity is not to substitute its view for that of the lower court; our task is rather to determine whether "a judicial mind, on due consideration of all the evidence, as a whole, could reasonably have reached the conclusion of the chancellor." *Masciantonio Will*, 392 Pa. 362, 367, 141 A.2d 362, 365 (1968). See also *Yuhas v. Schmidt*, 434 Pa. 447, 258 A.2d 616 (1969). A chancellor's findings of fact, approved by a court en banc, have all the force and effect of a jury's verdict if they are supported by adequate evidence and ordinarily will not be disturbed on appeal. *Jacobson & Co. v. International Environmental Corp.*, 427 Pa. 439, 235 A.2d 612 (1967).

With this standard of review in mind, we have carefully reviewed the record and find substantial evidence to support the chancellor's findings. He found that subsequent to Aiken's acquisition of National, Wilson engaged in the following activities: (1) made outright gifts of $60,000 to two of his former employees with full knowledge that this money would be used by them as initial capital for a company known as Compacting Tools, Inc. (Compacting), a company which the donees were then forming and which was organized to engage in direct competition with National; (2) rented to the same two former employees (the now owners and managers of Compacting) the building in which Compacting carried on its activities; (3) waived rent on the premises leased to Compacting for the first seven months of the lease because of the tight money situation at Compacting; (4) made two automobiles available to the former employees, both of whom used those vehicles in connection with the new business; (5) donated furniture and office equipment for use in the offices of Compacting; and (6) executed a waiver of his security interest (a landlord's lien) in Compacting's machinery located on the premises, thus enabling Compacting to negotiate a loan of $160,000 which it required to purchase necessary equipment. These findings properly led to the chancellor's conclusion that Wilson had

engaged in activities in connection with the "ownership, management, operation or control" of a competitor in direct violation of the express language of the contract.[4]

■ The appellants urge that Mr. Wilson did no more than engage in harmless acts of beneficence. We think, however, that the breach of a restrictive covenant such as the one here involved[5] does not depend upon a finding of specific intent to harm; the covenant is breached if the covenantor knowingly engages in activity the necessary effect of which will be to foster, if not instigate, competition. Assuming that Mr. Wilson was indeed motivated solely by benevolence towards his two close friends and former associates, it was incumbent upon him to give expression to that generosity in a manner consistent with the contractual duty he had but recently assumed with respect to Aiken.

## 2. The Measure of Damages.

With respect to the issue of damages, the chancellor awarded appellee $196,576.75. The appellants challenge this sum as being both speculative and improperly calculated.

At trial, Aiken presented convincing evidence to the effect that National's sales to 25 particular customers constituted 50% of its business in 1970 whereas after the incorporation of Compacting and the ensuing competitive activities of that

4. As indicated above, the contract of employment was part of the overall transaction between Wilson and Aiken. It contained the following covenant:

"Wilson recognizes that National is, and will in the future be, engaged in highly competitive businesses. During the employment period, and for any subsequent period of employment by Aiken, Wilson agrees that he will not, directly or indirectly, own, manage, operate, control, be employed by, participate in, or be connected in any manner, with the ownership, management, operation, or control of any business competitive with the business of National. . . ." (Record, at p. 654a).

5. Because the action for injunctive relief was withdrawn following the death of Wilson, see n. 1, *supra*, we need not be concerned with the reasonableness of the terms of covenant. See *Krauss v. M. L. Claster & Sons, Inc.*, 434 Pa. 403, 407, 254 A.2d 1, 3 (1969); *Gresh v. Potter McCune Co.*, 235 Pa.Super. 537, 344 A.2d 540 (1975).

company during the years in question, 1970 through 1972, National's sales to these same 25 customers declined by one-half, or by approximately $700,000. During this same period, Compacting had sales of $694,000, some 95% of which was attributable to the business of these same 25 customers who correspondingly decreased their orders to National. Aiken presented evidence showing the National Division's "marginal income percentage" [6] during the period 1970 through 1972 to be 44% and, applying this percentage to its $700,000 lost sales arrived at a figure of $308,000 as lost profits. The chancellor reduced the lost sales total to $400,-000 to take into account factors in the record which he found to be not directly attributable to the competition of Compacting (market recession, a strike in the automobile industry, etc.). He also found that 33⅓% was a more realistic "marginal income percentage" than 44%. Having made these adjustments, the chancellor determined that the lost profits suffered by National and attributable to the competition of Compacting were $133,330.

The appellants challenge the chancellor's calculation of $400,000 representing lost sales as "speculative." We recognize, however, that the breach of non-competition agreements of the type with which we are here concerned necessarily involves damages which are difficult to calculate with absolute precision. See *Ross v. Houck*, 184 Pa.Super. 448, 136 A.2d 160 (1957). The indefiniteness consequent upon this difficulty does not, however, by itself preclude

**6.** The trial record, the opinions of the trial court and the briefs of the parties all use the expression "marginal income percentage". The term is used loosely to describe an accounting procedure whereby profit may be determined by calculating pre-tax income generated by increased sales within a certain dollar range of sales. The profit is calculated by taking total sales (number of units × sales price per unit) and subtracting variable costs (costs which increase as production increases, such as cost of materials, direct labor, etc.) to arrive at "marginal income." From marginal income is subtracted fixed costs (costs remaining static regardless of volume of production, e. g., rent, fixed sales costs, etc.) to arrive at a profit figure for a particular volume of sales. The profit "percentage" is that percentage of total sales income remaining after deduction of fixed and variable costs. As sales increase, fixed costs per unit decrease and manufacturing profit increases.

relief. In *Massachusetts Bonding & Ins. Co. v. Johnstone & Harden, Inc.*, 343 Pa. 270, 278–80, 22 A.2d 709, 714 (1941), this Court stated:

". . . In *Osterling v. Frick et al., Executors*, 284 Pa. 397, 131 A. 250, this court held [second syllabus]: 'While damages cannot be based on a mere guess or speculation, yet where the amount may be fairly estimated from the evidence, a recovery will be sustained even though such amount cannot be determined with entire accuracy'.

\* \* \* \* \* \* \* \* \*

"Williston on Contracts, Revised Edition, Vol. 5, lays down these principles in respect to measuring damages: Section 1345, p. 3776, 'Though any breach of contract entitles the injured party at least to nominal damages, he cannot recover more without establishing a basis for an inference of fact that he has been actually damaged. A mere possibility that the plaintiff might have made a profit if the defendant had kept his contract will not justify damages based on the assumption that the profit would have been made. But though there must be evidence of substantial damage in order to justify recovery of more than a nominal sum, the exact amount need not be shown. Where substantial damage has been suffered, the impossibility of proving its precise limits is no reason for denying substantial damages altogether.'

\* \* \* \* \* \* \* \* \*

"The essence of the legal principles above cited is that compensation for breach of contract cannot be justly refused because proof of the exact amount of loss is not produced, for there is judicial recognition of the difficulty or even impossibility of the production of such proof. What the law does require in cases of this character is that the evidence shall with a fair degree of probability establish a basis for the assessment of damages."

See also *Solar Electric Corporation v. Exterminator Corporation of America*, 384 Pa. 233, 120 A.2d 533 (1956); *Lambert v. Durallium Products Corporation*, 364 Pa. 284, 72 A.2d 66

(1950); *Hahn v. Andrews*, 182 Pa.Super. 338, 126 A.2d 519 (1956). We believe that appellee Aiken presented evidence enough to prove that it had suffered substantial damages and that the amount of $400,000 determined by the chancellor to represent sales lost because of the breach of contract does "with a fair degree of probability establish a basis for the assessment of damages." *Massachusetts Bonding, supra.* The contrary standard urged by appellants would encourage the violation of contracts with impunity, the breaching party resting secure in the knowledge that the injured party would be unable to prove damages with the nice precision which appellant would require. Cf. *Weinglass v. Gibson*, 304 Pa. 203, 155 A.2d 439 (1931).

■■ We do, however, agree with appellants that the chancellor erred in determining what percentage of these lost sales would have constituted profit to Aiken. Lost profits are the "net pecuniary gain from a transaction, the gross pecuniary gain diminished by the cost of obtaining them." Restatement of Contracts, § 331, Comment (b). See also 22 Am.Jur.2d Damages, § 178, p. 253 and cases cited. The "marginal income percentage" procedure, *see* n. 6, *supra*, when properly applied, can result in an accurate estimate of lost net profits. In the present case, however, the profit margin of 44% claimed by appellee failed to take into account costs normally incurred by appellee before arriving at a valid net profit figure.[7] Although the chancellor did

7. Aiken presented the following statistical analysis in support of its claimed "marginal income percentage" of 44%:

STATEMENT OF EARNINGS
NATIONAL CARBIDE DIE DIVISION OF
AIKEN INDUSTRIES, INC.

|  | 1968 | 1969 | 1970 | 1971 | 11 Months 1972 |
|---|---|---|---|---|---|
| Net Shipments | 1,368,801 | 1,791,820 | 1,683,482 | 1,318,497 | 1,549,407 |
| Variable Costs | 683,178 | 866,059 | 981,924 | 736,877 | 822,540 |
| % | 49.9 | 48.3 | 58.3 | 55.9 | 53.1 |
| Margin | 685,623 | 925,761 | 701,558 | 581,620 | 726,867 |
| % | 50.1 | 51.7 | 41.7 | 44.1 | 46.9 |

(Plaintiff's Damage Exhibit 12g. Record at 1028a.)
It is, however, clear that this information established only that percentage of total sales income remaining after deduction of varia-

reduce this figure to 33⅓%, how he arrived at this percentage nowhere appears. As we stated in *Solar Electric Corporation v. Exterminator Corp., supra* :

> "It is true that where there is a basis in the evidence for a reasonable computation of the damages suffered, considering the nature of the transaction, a verdict may be based thereon, though there may be involved some uncertainty about it; *Weinglass v. Gibson,* 304 Pa. 203 (1931); *nevertheless, where damages are susceptible of being proved the amount must be established with certainty* : *Forrest v. Buchanan,* 203 Pa. 454, 53 A. 267 (1902)." 384 Pa. at 235, 120 A.2d at 534 (emphasis added).

We think that the chancellor should have determined, with some degree of specificity, what the net profit percentage, *see* n. 6, *supra,* would have been for the years 1970 through 1972 had National's sales volumes for those years included sales lost due to the competition of Compacting. That percentage would then be applied to the lost sales total (found by the chancellor to be $400,000) in order to arrive at a lost profit figure for the period in question.

■ Appellants next challenge the award of $35,000 for the training of National employees to replace those who defected to Compacting. Aiken presented evidence to the effect that all eight of the employees who went to Compacting were skilled machine operators possessing two or more years experience; that these eight employees constituted 100% of Compacting's work force; and that National normally experienced no turnover of skilled employees who had two or more years experience. Aiken also presented evi-

---

ble costs. To establish a *net* profit, it is necessary also to deduct other fixed costs. *See* n. 6, *supra.* That these figures failed to establish a net profit is evident from the testimony of Aiken's Division Controller, Mr. Robert Zimmerman. Referring to the above exhibit, Mr. Zimmerman stated: "It does not show net earnings. It only indicates marginal earnings where other costs are generally deducted after that before you arrive at taxable income." (Record at 924a.)

dence that training of replacement personnel would cost $100,000, a figure which the chancellor, based on evidence in the record, reduced to $35,000. An award of damages based upon the cost of training these new employees was proper and we find nothing so shocking in the amount of the award for this item as to require a modification of the chancellor's findings. *James v. Ferguson*, 401 Pa. 92, 162 A.2d 690 (1960). Furthermore, appellants presented no evidence to contradict the estimate of the cost of training. Our observation in *Lobozzo v. Eidemiller, Inc.*, 437 Pa. 360, 263 A.2d 432 (1970) is applicable here:

> "With regard to the second issue, the amount of the damages, the only testimony introduced was by Lobozzo's witnesses who gave estimates of the cost of repairs. While these estimates may have been somewhat high, Eidemiller introduced no testimony indicating a lower repair cost. We cannot say that the jury was in error in accepting the only evidence presented to them on the amount of damages." 437 Pa. at 368, 263 A.2d at 436–37.

■ Finally, because of Mr. Wilson's breach of his fiduciary duty to Aiken, the chancellor awarded $25,000 constituting the salary paid to Wilson during the period of Compacting's competition.[8] We believe that such a finding and award were unnecessary to the disposition of the present case. Aiken has already been awarded damages comprised of lost profits, the purpose of which was to make Aiken whole by placing it in the same position it would have been in had the contract not been breached. *Maxwell v. Schaefer*, 381 Pa. 13, 112 A.2d 69 (1955). See generally, Restatement of Contracts, § 329; 5 Corbin on Contracts, § 992, Chap. 55. To allow Aiken to recoup also its expenses under the contract would be tantamount to a duplication of dam-

8. Since we are of the opinion that this item of damages was subsumed in the award of lost profits, and since the finding of a breach of a fiduciary duty was only necessary in order to support this award, we see no reason to pass upon the correctness of the finding of breach of duty.

ages. See *Maxwell v. Schaefer, supra.* Mr. Wilson's salary was just such an expense and may not be the basis of an award based upon the same breach.[9]

In light of the foregoing, the subscribers to this opinion would vacate the decree of the court below insofar as it fixes the amount of damages which appellee has sustained, and remand the case to the court of common pleas so that the amount of damages due to the plaintiff may be recalculated in accordance with the views herein expressed. We would also permit the trial court to take such additional evidence as may be deemed necessary or desirable for this purpose.

EAGEN, C. J., and O'BRIEN, J., join in this opinion.

ROBERTS, Justice, in support of reversal.

In my view, the conduct of Thomas Wilson, appellant's testator, was not specifically proscribed by the language of the restrictive covenant.

NIX, Justice, in support of reversal.

The opinion in support of affirmance prefaces its discussion of the alleged breach of the covenant not to compete by noting that the scope of review of the factual findings of the chancellor is limited. *Masciantonio Will,* 392 Pa. 362, 367, 141 A.2d 362, 365 (1968). I note at the outset that this reference is misleading in that the instant facts which allegedly constitute the breach are not in dispute. The only issue is the legal effect of Wilson's conduct. For this purpose, this Court clearly need not give deference to the

**9.** It is true that the awards of damages were based upon two different theories—one a contractual breach, the other a breach of fiduciary duty—but nevertheless, both theories included the same actions on the part of Wilson. Having been awarded damages based upon the fiction that Wilson fulfilled his duty under the contract, appellees are precluded from receiving additional damages premised on the non-fulfillment of that same duty. See generally, *Myshko v. Galanti,* 453 Pa. 412, 309 A.2d 729 (1973).

legal conclusions of the chancellor. *See Snow v. Corsica Constr. Co., Inc.,* 459 Pa. 528, 329 A.2d 887 (1974); *Field v. Golden Triangle Broadcasting, Inc.,* 451 Pa. 410, 305 A.2d 689 (1973), *cert. denied,* 414 U.S. 1158, 94 S.Ct. 916, 39 L.Ed.2d 110 (1974); *Baldassarre v. Rare Metals Derivatives,* 444 Pa. 100, 282 A.2d 262 (1971); *Yuhas v. Schmidt,* 434 Pa. 447, 258 A.2d 616 (1969).

More importantly, it is my view that the facts in the instant case do not constitute a breach of the covenant not to compete. Contracts in restraint of trade should be strictly construed. *Hayes v. Altman,* 438 Pa. 451, 266 A.2d 269 (1970). Additionally, words in a contract are to be construed according to their common and ordinary meaning. *Pines Plaza Bowling, Inc. v. Rossview, Inc.,* 394 Pa. 124, 145 A.2d 672 (1958); *Connell v. Avon Garage,* 391 Pa. 189, 137 A.2d 765 (1958); Restatement, Contracts § 235(a). Applying these principles to the instant case, it becomes apparent that Wilson did not breach his contract with Aiken Industries. The language of the restrictive covenant reads as follows:

"Wilson recognizes that National is, and will in the future be, engaged in highly competitive businesses. During the employment period, and for any subsequent period of employment by Aiken, Wilson agrees that he will not, directly or indirectly, own, manage, operate, control, be employed by, participate in, or be connected in any manner, with the ownership, management, operation or control of any business competitive with the business of National . . . "

The words "connected in any manner, with the ownership, management, operation or control" should be narrowly construed so as not to encompass the limitless range of activities that the interpretation of the opinion in support of affirmance would permit. The ordinary meaning of "ment" as defined in Webster's Third New International Dictionary is the act of "direct[ing] or carry[ing] on business or affairs." Similarly, "operation" is defined as the "doing or performing of a practical work or of something involving practical

application of principles or processes." The word "control" is defined as exercising a "restraining or directing influence over and to have power over." "Ownership" means having a "lawful claim or title."

Viewing Wilson's activities allegedly connected with Compacting Tooling, it appears that he gave money to two of Compacting's founders, Delo and Zebrovious. Wilson received no stock or securities in Compacting nor a position on the board of directors, nor office in the company in return for the money. He gained no right to participate in the business affairs of the company. Clearly, the gift of money from Wilson to Delo and Zebrovious, honoring a previous employment commitment, does not qualify as being "connected with ownership, management, operation or control" of Compacting. Likewise, Wilson's leasing of rental property to Compacting, deferring the rent payment, and waiving the lessor's lien can only be characterized as activity pursuant to Wilson's real estate business, which Aiken expressly permitted Wilson to continue. Again, this activity gave Wilson no ownership interest in Compacting, nor any right to participate in the business of Compacting, nor a position of control. Finally, the covenant not to compete must be stretched to a ridiculous extent in order to find that Wilson's loan of office furniture and automobiles for several weeks constituted or contributed to a breach.

I would reverse the decree of the chancellor.

MANDERINO, Justice, in support of reversal.

Although a covenant not to compete may be valid when given by a seller to the buyer of a business, it must be limited to preventing the use in competition with the buyer, of that which the seller has purportedly sold to the buyer. For example, the seller may be contractually prevented from competing by using the goodwill, reputation, or name of the business that has been sold if those items form a part of the consideration for the transaction. A covenant by which the seller is forbidden from transferring, by gift or loan, money

or other property to anyone who might compete with the buyer is an illegal restraint of trade. Thus, if the covenant in this case specifically prohibited the seller from giving money to anyone he knew would use that money to finance a competitor of the buyer, it would be illegal. The covenant in this case does not prohibit such gifts however. Because Thomas Wilson's giving of gifts to his friends and former employees did not violate the covenant not to compete with appellee, I would reverse the order of the Court of Common Pleas.

The agreement between Wilson and appellee provided: "That Wilson may continue to devote an amount of time not to exceed the time now being spent by him to the affairs of those other businesses in which he is presently engaged."

The agreement also included a restraint of trade clause which read as follows:

"Wilson recognizes that National is, and will in the future be, engaged in highly competitive businesses. During the employment period, and for any subsequent period of employment by Aiken, *Wilson agrees that he will not, directly or indirectly, own, manage, operate, control, be employed by, participate in, or be connected in any manner, with the ownership, management, operation, or control of any business competitive with the business of National* within the continental United States or Canada . . . ." (emphasis added)

The opinion in support of affirmance concludes that this covenant is breached "if the covenantor knowingly engages in activity the necessary effect of which will be to *foster, if not instigate, competition*." (Emphasis added). This conclusion is not only contrary to the express terms of the agreement, it also contradicts established case law both in this jurisdiction and elsewhere and constitutes an illegal restraint of trade.

In *Harkinson's Appeal*, 78 Pa. 196 (1875), our court reversed the trial court's decree which held that the seller of a bakery and confectionary establishment violated her covenant not to engage, directly or indirectly, in the same business by establishing her son in such a business without having any personal interest in that business herself. The seller in *Harkinson's Appeal*, like the seller in the instant case, had no intention of engaging in the new business and was in no way interested or involved in it. The seller in *Harkinson's Appeal* advanced money to her son knowing that the son would use that money to set up his own bakery and confectionary business which would compete with the buyer's establishment.

Similarly, in *Slate Co. v. Bikush*, 343 Mass. 172, 177 N.E.2d 780 (1961), the sellers gave financial assistance to their son-in-law, who was engaged in the same kind of business and was in competition with the buyer. The sellers' financial assistance consisted of being co-makers of a note so that their son-in-law could secure a loan to finance his business and by taking an assignment of accounts receivable to secure them against loss. The court held that these actions did not violate their agreement not to compete or to do anything to prejudice the goodwill sold, because the sellers made no use of their experience, had no ownership or operating interest in the competing business, gave no publicity to their extension of financial assistance, and because the sellers' activity did not attract customers of the business sold to the son-in-law's business.

In *Thomas v. Thomas Truck and Caster Co.*, 228 N.W.2d 52 (Iowa 1975), the court held that an agreement "not to engage as consultant or otherwise to any competitor" was not violated when the seller made gifts and loans to a son who used them in a business competing with that of the buyer. In *Buchingham Tool Corp. v. Evans*, 35 Mich.App. 74, 192 N.W.2d 362 (1971), the court held that the seller of a tool and die business did not breach a covenant not to compete where the seller built a building to lease to his son

for a tool and die business and guaranteed the lease of boring mills for his son, but did not participate in the operation of the business, did not have a financial interest in it, and did not counsel his son as to business matters. See also, *McKeighan Wachter Co. v. Swanson*, 138 Wash. 682, 245 P. 10, aff'd on reh. 141 Wash. 694, 250 P. 353 (1926); and *Gallup Electric Light Co. v. Pacific Improvement Co.*, 16 N.M. 86, 113 P. 848 (1911).

Our scope of review of a chancellor's findings of fact and of the conclusions of law and fact affirmed by the court en banc, is stated in *Van Products Co. v. General Welding and Fabricating Co.*, 419 Pa. 248, 257, 213 A.2d 769, 774 (1965):

"It is fundamental that the findings of fact of a chancellor which are approved by the court en banc have the weight of a jury's verdict, and will not be disturbed on appeal if there is adequate evidence in the record to sustain the findings. *On the other hand, it is equally well established that the chancellor's conclusions, whether of law or fact, being no more than his reasoning from the underlying facts, are reviewable.*" (Emphasis added, citations omitted)

See also, *Felmlee v. Lockett*, 466 Pa. 1, 351 A.2d 273 (1976).

On the issue of whether the noncompetition covenant was breached, the chancellor concluded: "there can be no doubt that Wilson did indeed *participate in* and *was connected with* the establishment of a competing business." (Emphasis added.) This is a *conclusion* which must be reviewed in conjunction with the general rule as stated by this Court in *Hayes v. Altman*, 438 Pa. 451, 266 A.2d 269 (1970):

" . . . because restrictive covenants are a partial restraint upon the free exercise of trade, we have frequently stated that *they should be strictly construed.*" (Emphasis added.)

In applying this standard, I conclude there was not sufficient evidence in the record for the chancellor's conclusion that the noncompetition covenant was breached.

The covenant, signed by Wilson, that he would not " . . . directly or indirectly, . . . *participate in* or

*be connected in any manner . . .* " was limited by the clause "*with the ownership, management, operation or control* of any business competitive with the business of National . . . " (Emphasis added.) Even if we were to conclude, therefore, that the five transactions in question constituted a participation in or connection with a competing business, or, as stated by the majority, that they *fostered* competition it cannot be said that those activities dealt with "the ownership, management, operation or control" of a competitor.

It is, of course, undisputed that Wilson had no ownership interest in the new business, nor did he participate in its management, operation or control. He received no return from the business. I fail to see how the express terms of the agreement can be stretched to proscribe acts of generosity which incidentally turned out to increase Aiken's competition in business.

The opinion in support of affirmance states that it is irrelevant that these were gifts, motivated only by generosity, if their effect was to foster competition against Aiken. Such a view loses sight of the principles behind this area of law. The only legal justification in a century of case law allowing restrictive covenants ancillary to the sale of a business has been to keep the seller from retaining and using for his or her profit the goodwill—the name and reputation—which was purportedly sold.

Covenants not to compete have never been favored, and are valid only when they are related to either a contract for the sale of goodwill or to a contract for employment. *Piercing Pagoda, Inc. v. Hoffner*, 465 Pa. 500, 351 A.2d 207 (1976); *Maintenance Specialties v. Gottus*, 455 Pa. 327, 331, 314 A.2d 279, 281 (1974); *Jacobson & Co. v. International Environmental Corp.*, 427 Pa. 439, 235 A.2d 612 (1967); *Capital Bakers, Inc. v. Townsend*, 426 Pa. 188, 231 A.2d 292 (1967); *Barb-Lee Mobile Frame Co. v. Hoot*, 416 Pa. 222, 206 A.2d 59 (1965); *Morgan's Home Equipment Corp. v. Martucci*, 390 Pa. 618, 136 A.2d 838 (1957). See also Restatement of Contracts § 515(e) (1932). They are permitted not for the

purpose of protecting a buyer against all competition, such would be against public policy. Rather, the law has caused an exception from its usual prohibition on restraint of trade, limited to the extent necessary to protect the buyer of the *goodwill* of a business.

General covenants not to compete which are ancillary to the sale of a business serve a useful economic function; they protect the asset known as "good will" which the purchaser has bought. Indeed, in many businesses it is the name, reputation for service, reliability, and the trade secrets of the seller rather than the physical assets which constitute the inducements for a sale. *Morgan's Home Equip. Corp. v. Martucci*, 390 Pa. 618, 631, 136 A.2d 838, 846 (1957).

Thus it is indeed relevant that these were gifts to the former employees, gifts of money, rent or supplies gave Wilson no financial interest in the new business. Even more importantly they imparted to the new business no connection with the name, reputation, or reliability—the good-will—which had attached itself to Mr. Wilson's former business.

Only if Wilson had taken some interest or return so as to associate his reputation, his name, or his services with the new business could he be said to have breached the covenant. Mere monetary gifts do not suggest Wilson's involvement in the enterprises any more than a bank loan would suggest that the bank was involved in the operation of the borrower's business.

Wilson often gave generous gifts to his friends and employees. The evidence overwhelmingly supports the conclusion that the gifts which caused the controversy at issue here were no more than expressions of gratitude conforming to a long-established pattern of generosity.

Wilson was a philanthropist who made large gifts to civic and charitable programs. When he sold his business to Aiken at the end of 1967, the agreement provided that Wilson would receive additional compensation for the sale dependent upon the profits of National for 1968 and 1969.

After the first quarter of 1968, Wilson gave employees of Aiken, from his own pocket, the equivalent of one-half of the Aiken's profits for the first quarter of 1968, or approximately $54,000. Aiken regarded Wilson as paternalistic in his relations with his employees and complimented Wilson for making the gift. On another occasion Wilson had made a gift to one of his employees of about $25,000.00.

When Wilson was discussing the sale of his business to Aiken in 1967, he told the Chairman of the Board of Aiken, Mr. H. Norton Stevens, of his intentions toward National employees. Stevens testified that Wilson had wished to share a part of the purchase price of the sale of National to Aiken, with some of his trusted employees. Apparently this was an expression of his gratitude for their efforts and as a reassurance to them that the sale would not affect their security at National. Stevens also admitted that in 1968, Wilson told him that he planned to make gifts to his employees, including Delo and Zebrovious, the new owners of Compacting Tools, Inc. Stevens also admitted that Wilson's "management style" involved not only giving gifts to his employees, but tailoring those gifts to the particular needs of the recipient. For example, Wilson maintained a farm for one employee, and for another provided special education.

Audrey Delo and Harry Zebrovious were longtime employees of Wilson. Delo had worked for Wilson since 1951, both at National and in Wilson's real estate development and leasing business. She was one of Wilson's key employees, and had served as his right arm in the business. Delo was also a close personal friend of Wilson, and had previously received numerous gifts from him including a diamond pendant, a horse, furnishings and improvements for her home, paid vacations and the use of Wilson's summer homes. Harry Zebrovious began working for Wilson at National in 1959 and had advanced from a machine operator to vice-president of National's operations.

In October of 1969, Wilson fell during a luncheon with Aiken executives and injured his head. Wilson remained

seriously ill and was in and out of the hospital for a five-month period, being hospitalized for some seven weeks. He had three major and two minor operations. During this period Audrey Delo conducted Wilson's industrial development business.

In February and March 1970, Wilson made a gift to Delo of $30,000 and a gift to Zebrovious of $30,000.

These gifts gave Wilson no interest in the new business and did not link his name with it in any way. The gifts stand on no different footing than a loan to these persons from any other source, since any transaction which merely provides financing and no more, is an independent transaction unrelated to the formation of the business.

I also note that many of the activities complained of were naturally incident to Wilson's real estate business, which the covenant expressly *permitted* his to continue. That business involved the development and leasing of industrial and commercial real estate in three counties. Wilson's industrial parks housed about fifteen tenants, including competitors of the business sold to Aiken. Thus, his leasing of commercial property and furniture and his activities as landlord can hardly be said to be related to either Aiken's or Compacting's business. They were the primary functions of his real estate operation.

I find no breach of covenant in this case, and therefore would reverse the order of the trial court.