**Lucciotti v. American Management Advisors Inc.**

*Peter Heilman,* for plaintiff.
*AdamShapiro,* for defendant.

MELLON, *J.,* November 6, 2007—

## FINDINGS OF FACT

(1) Plaintiff Robert Lucciotti was director of underwriting for defendant American Management Advisors Inc. (AMA) pursuant to a series of contracts between 1993 and 2004.

(2) At all times relevant, AMA was involved in the acquisition, underwriting and servicing of intercollegiate sports insurance policies.

(3) As director of underwriting plaintiff's duties included: "underwriting for applications on the behalf of various insurance companies, for college sports insurance, college accident and sickness insurance, college major medical insurance, special sports and activities insurance, [and] student accident insurance (grades K-12)."[1]

(4) Plaintiff's underwriting efforts took place from January to August of each year.[2]

(5) Pursuant to the agreement between plaintiff and AMA, and inherent in the collegiate insurance industry, there was a delay between when policies were placed and the payment of premium income to AMA.[3]

(6) Plaintiff placed policies with colleges, and income attributable to those policies was paid over the course of the school year. As a result, AMA's internal accounting was done on an accrual basis; from September to August.[4]

(7) Plaintiff drafted proposals and submitted them for approval by insurance companies. Once approved, the colleges incorporated the cost of the policies into tuition. Then, as students paid their tuition in August and December, the colleges would remit payment for the policies to AMA.[5]

---

1. See pl.'s exhibit no. 3. May 15, 2001 agreement between AMA and Robert Lucciotti.
2. CT 1 p. 13 lines 1-3.
3. CT 1 p. 12 lines 18-25; p. 13 lines 1-7.
4. CT 1 p. 13 lines 10-24; p. 20 lines 16-25.
5. CT 1 p. 12 lines 18-25; p. 13 lines 1-23.

(8) Pursuant to their agreement, plaintiff and AMA customarily met each September to tabulate plaintiff's final compensation based on collected income attributable to the prior school year's underwriting effort.[6]

(9) Plaintiff surrendered his insurance license on May 21, 2001 following convictions for crimes in violation of the Violent Crimes Control and Law Enforcement Act of 1994.[7]

(10) Pursuant to the terms and conditions of a consent order issued under the authority of the Insurance Commissioner of the Commonwealth of Pennsylvania plaintiff's ability to work in the insurance industry was limited.[8]

(11) Violation of the consent order, either by plaintiff or AMA, carried financial penalties and possibly imprisonment.[9]

(12) Pursuant to the contract between plaintiff and AMA dated May 25, 2001 (2001 contract), plaintiff's duties were modified to permit him to continue in his capacity as director of underwriting without violating the consent order.

(13) The 2001 contract remained in effect until December 31, 2003.[10]

(14) Plaintiff and AMA executed a contract (2004 contract), effective as of January 1, 2004, wherein plain-

---

6. CT 1 p. 20 lines 22-25; p. 21 lines 1-2.

7. CT 1 p. 78 lines 15-18; see deft.'s exhibit no. 3. Consent order; 18 U.S.C. §1033(e)(1)(b) (2000).

8. See deft.'s exhibit no. 3.

9. CT 2 p. 63 line 25; p. 64 lines 1-15.

10. See deft.'s exhibit no. 4. Consulting agreement between AMA and Robert Lucciotti.

tiff's compensation was to be calculated over a calendar year.

(15) The 2004 contract purported to expire on January 1, 2005.[11]

(16) AMA terminated its relationship with plaintiff on August 9, 2004.[12]

### 2001 Contract

(17) The 2001 contract provides a formula for the calculation of plaintiff's compensation and bonus:

"Compensation shall be net profits (*earned and received* by AMA which are directly attributable to [plaintiff's] efforts) less related expenses." (emphasis added)[13]

(18) The expense allocations prepared by AMA's bookkeeper and audited by an outside certified public accountant that AMA used to calculate plaintiff's compensation for the 2002-2003 school year are accurate.[14]

(19) The expense allocations AMA applied against plaintiff's compensation for the 2002-2003 and 2003-2004 school years are accurate.[15]

(20) The reason that expense allocations increased was because AMA undertook an increased role in the maintenance and service of plaintiff's accounts in conformity with the consent order.[16]

---

11. *Id.*

12. CT 1 p. 14 lines 22-24.

13. See pl.'s exhibit no. 3. May 15, 2001 agreement between AMA and Robert Lucciotti.

14. See deft.'s exhibits nos. 18 and 19.

15. CT 2 p. 37 line 19—p. 50 line 22.

16. CT 2 p. 64 lines 20-25; p. 65 lines 1-14.

(21) Plaintiff accepted and retained a check dated September 9, 2003 for $87,010 from AMA reflecting in its memo line: "Final 0203 YR".[17]

(22) From at least 1999 until 2003, pursuant to the terms of the effective contract and the accepted practice of the parties, plaintiff's bonus was calculated on an accrual basis, beginning in September 1 and concluding on August 31.[18]

(23) Plaintiff's underwriting efforts for the 2003-2004 school year occurred between January and June of 2003. Plaintiff's 2003 underwriting efforts produced income for AMA between September 2003 and June 2004.[19]

(24) AMA collected income from plaintiff's 2003 underwriting efforts between September 2003 and June 2004. AMA did not, however, credit income received thereafter toward plaintiff's bonus.[20]

(25) Plaintiff received a $24,000 advance on his bonus through April of 2004,[21] and a weekly draw totaling $126,000.[22]

(26) AMA income for the 2003-2004 school year was $977,798.[23]

(27) In the absence of documented expense allocations, $295,613 is an acceptable estimated expense allocation

---

17. See CT 1 p. 93 lines 1-16; see deft.'s exhibit no. 2. Photocopy of check payable to Robert Lucciotti.

18. CT 2 p. 19 lines 12-24; p. 20 lines 1-2.

19. CT 2 p. 24 lines 24-25; p. 25 lines 1-2.

20. CT 2 p. 26 lines 5-25.

21. CT 1 p. 43 lines 12-23.

22. CT 1 p. 44 lines 12-13; see pl.'s exhibit no. 15.

23. See pl.'s exhibit no. 15.

for plaintiff's underwriting efforts for the 2003-2004 school year.[24]

(28) Pursuant to the 2001 contract plaintiff is entitled to a $121,912 bonus for his underwriting efforts in the 2003-2004 school year.[25]

## 2004 Contract

(29) On August 27, 2003, Janet Hogeland sent plaintiff a letter advising him that the 2001 contract was not going to be renewed, but that AMA intended to renegotiate his contract.[26]

(30) Plaintiff was under no pressure other than the impending threat of unemployment to execute the 2004 contract.[27]

(31) Plaintiff read the terms of the 2004 contract and understood that executing it would likely decrease his future compensation.[28]

(32) The 2004 contract provided a formula for the calculation of plaintiff's compensation and bonus:

"AMA shall pay [plaintiff] an annual bonus no later than January 31 of each year for his performance in the preceding calendar year. The bonus shall be equal to 40 percent of AMA's net profits from underwriting.

"Net profits from underwriting shall be determined by the following formula: Net profits from underwriting = Total revenue from [plaintiff's] underwriting activities

---

24. CT 1 p. 35 lines 8-24.
25. CT 1 p. 45 lines 1-4; see pl.'s exhibit no. 15.
26. See deft.'s exhibit no. 1.
27. CT 1 p. 57 lines 24-25; p. 58 lines 1-2.
28. CT 1 p. 59 lines 2-7.

minus the sum of (i) direct costs, (ii) selling expenses, (iii) claim services fees, (iv) general administrative expenses multiplied by the expense ratio."[29]

(33) Janet Hogeland's compilation of income and expenses attributable to plaintiff's underwriting efforts for the 2004 calendar year based on a schedule of expenses prepared by an outside certified public accountant is accurate.[30]

(34) Plaintiff's underwriting efforts for calendar year 2004 resulted in a financial loss for AMA.[31]

(35) The 2004 contract provides that deducted expenses would include both direct costs and a percentage of all general administrative expenses. AMA has presented a list of general administrative expenses prepared by its outside CPA, and plaintiff has offered no credible testimony that the audited figures are incorrect. The court finds that the expenses used in determining plaintiff's eligibility for a bonus for his 2004 underwriting efforts to be accurate.[32]

(36) AMA correctly attributed all income received through December 31, 2004 to plaintiff. After applying expenses and plaintiff's draw of $95,538.70 for seven months work, in addition to $24,000 advance already paid to plaintiff, against the income received by AMA for all of 2004, no additional bonus was due plaintiff.

(37) The 2004 contract provides:

"*Weekly draw.* As compensation for [plaintiff]'s performance of the [underwriting] services, AMA shall pay

---

29. See deft.'s exhibit no. 4 at ¶2(b).
30. See deft.'s exhibit nos. 17 and 18.
31. See deft.'s exhibit no. 17.
32. See deft.'s exhibit nos. 17 and 18.

[plaintiff] a weekly draw of $2,307.70 for each week during the term of this agreement. [Plaintiff]'s weekly draw shall be applied against his bonus and if the amount of the bonus is less than the draw which was paid, no additional payment shall be due; however, [plaintiff] shall not be liable to reimburse AMA for any such excess payment."[33]

(38) Pursuant to the 2004 contract, plaintiff is entitled to no further compensation for his underwriting efforts in the 2004 calendar year.

(39) AMA's January 28, 2005 letter to plaintiff is accurate.[34]

## Restrictive Covenant

(40) The 2004 contract contains a restrictive covenant that provides:

"that for so long as [plaintiff] is an advisor or contractor to AMA and for two years thereafter (the restricted period), [plaintiff] will not directly or indirectly, own, manage, operate, join, control, finance or participate in the ownership, management, operation, control or financing of, or be connected as a partner, principal agent, representative, [plaintiff] or otherwise with or use or permit [plaintiff]'s name to be used in connection with, any business or enterprise engaged directly or indirectly in competition with the business of providing insurance, underwriting, MGA, TPA, or brokerage services to schools, colleges, universities, educational institutions,

---

33. See deft.'s exhibit no. 4 at ¶2(a).

34. See deft.'s exhibit no. 5. January 28, 2005 letter from AMA to Robert Lucciotti.

public bodies or entities, or local governments (the business) at any time during such period within any portion of the United States (and any other geographic area AMA expands into)."[35]

(41) Before working as director of underwriting for AMA, plaintiff maintained clients, accounts, and contacts nationally which he brought with him to AMA.[36]

(42) Plaintiff testified credibly that as of January 2005, he had several employment leads in the insurance industry, which were withdrawn when AMA notified the third parties of its intention to enforce the restrictive covenant.[37]

(43) Plaintiff testified credibly that the Huffaker Agency and The Riley Group had "expressed interest in working with [him]",[38] and that Vonda White "wanted [him] to do underwriting for her."[39]

(44) Plaintiff's claims for damages relating to AMA's enforcement of the restrictive covenant are unsupported by the record.

## CONCLUSIONS OF LAW

(1) When interpreting the language of a contract, the intention of the parties is a paramount consideration.[40]

---

35. See deft.'s exhibit no. 4 at ¶5(a). Restrictive covenant.

36. CT 1 p. 6 lines 14-22.

37. CT 1 p. 52 line 12—p. 56 line 25; see pl.'s exhibits nos. 8-10. Letters transmitted by AMA to prospective clients of plaintiff advising about pending restrictive covenant.

38. CT 1 p. 53 lines 18-25; p. 54 lines 1-6.

39. CT 1 p. 53 lines 21-23.

40. *Profit Wize Marketing v. Wiest,* 812 A.2d 1270 at 1275 (Pa. Super. 2002).

## 2001 Contract

(2) This court finds that plaintiff's dispute over the expense allocation for the 2002-2003 school year was discharged under the doctrine of accord and satisfaction when plaintiff accepted and retained a check from AMA that stated: "Final 0203 YR".[41]

(3) This court finds that plaintiff failed to meet his burden in asserting that the expense allocation for the 2003-2004 school year is any other than that produced by AMA. Accordingly, the court accepts that expenses attributable to plaintiff's underwriting efforts for the 2003-2004 school year totaled $295,613.

(4) This court finds that AMA materially breached the 2001 contract by failing to compensate plaintiff for the income AMA received after January 1, 2004 attributable to his 2003 underwriting efforts.[42]

(5) This court finds that the language "earned and received" relating to the calculation of plaintiff's compensation in the 2001 contract is ambiguous.[43]

(6) This court finds that the intention of the parties, as evinced by their established practice, was to recognize

---

41. Accord and satisfaction is constituted where there is: (1) a disputed amount; (2) a clear and unequivocal offer of payment in full satisfaction and; (3) acceptance and retention of payment by the offeree. *Fleming v. CNA Ins. Co.,* 52 F. Supp.2d 499 at 502 (E.D. Pa. 1999) (applying Pennsylvania law).

42. *Oak Ridge Construction Co. v. Tolley,* 351 Pa. Super. 32 at 41, 504 A.2d 1343 at 1348 (1985) (adopting Restatement (Second) of Contracts §241).

43. *Profit Wize Marketing v. Wiest,* 812 A.2d 1270 at 1275 (Pa. Super. 2002).

income as "earned" upon the acceptance by the colleges of plaintiff's underwriting proposals.[44]

(7) This court finds that the intention of the parties, as evinced by their established practice, was to recognize income as "received" upon payment to AMA.

(8) This court finds that plaintiff became entitled to compensation when income was "earned". AMA became bound to compensate plaintiff under the terms of the 2001 contract for his underwriting efforts once income was "received".

(9) This court finds that plaintiff's 2003 underwriting efforts entitle him to a bonus in accordance with the terms of the 2001 contract for the income that was paid to AMA after December 31, 2003.

*2004 Contract*

(10) This court finds that AMA did not materially breach the 2004 contract.[45]

(11) This court finds that plaintiff was not under duress when he executed the 2004 contract.[46]

(12) This court finds that plaintiff consented to the tabulation of his compensation in accordance with the terms of the 2004 contract.

---

44. In the absence of an express provision to the contrary, custom or usage, once established, is considered a part of a contract and binding on the parties though not mentioned therein, the presumption being that they know of and contracted with reference to it. *Resolution Trust Corp. v. Urban Redevelopment Authority of Pittsburgh,* 536 Pa. 219 at 226, 638 A.2d 972 at 976 (1994).

45. See n.42 and accompanying text.

46. *Carrier v. William Penn Broadcasting Co.,* 426 Pa. 427, 233 A.2d 519 (1967).

(13) This court finds that the restrictive covenant provided by the 2004 contract is invalid and unenforceable.[47]

(14) This court finds that the restrictive covenant was not accompanied by a corresponding benefit to the plaintiff, nor supported by other contemporaneous consideration.[48]

(15) This court finds that the damages claimed by plaintiff for AMA's wrongful enforcement of the restrictive covenant sustained when the Huffaker Agency, and The Riley Group withdrew their "expressed interest" and Vonda White withdrew her desire to do business with plaintiff are too speculative to be recoverable.[49]

## DISCUSSION

### A. This Court Finds That AMA Breached the 2001 Contract

When interpreting the language of a contract, the intention of the parties is a paramount consideration.[50] In determining the intent of the parties to a written agreement, the court looks to what they have clearly expressed, for the law does not assume that the language of the contract was chosen carelessly.[51] On the contrary, the

47. *Maintenance Specialties Inc. v. Gottus,* 455 Pa. 327 at 331, 314 A.2d 279 at 282 (1974).

48. *Id.* at 330, 314 A.2d at 281.

49. *Aiken Industries Inc. v. Estate of Wilson,* 477 Pa. 34 at 42, 383 A.2d 808 at 812 (1978).

50. *Profit Wize Marketing v. Wiest,* 812 A.2d 1270 at 1275 (Pa. Super. 2002).

51. *Id.*

terms of a contract are ambiguous if the terms are reasonably or fairly susceptible of different constructions and are capable of being understood in more than one sense.[52] Where the agreement is ambiguous, parol evidence is admissible to ascertain the intent of the parties.[53] In addition, the parol evidence rule does not apply in its ordinary strictness where the existence of a custom or usage to explain the meaning of words in a writing is concerned.[54]

This court is charged to ascertain the intent of the parties under the 2001 contract as it relates to plaintiff's compensation. Therefore, the court first examines the language of the 2001 contract. The 2001 contract provides: "Compensation shall be net profits (*earned and received* by AMA which are directly attributable to [plaintiff's] efforts) less related expenses." (emphasis added)[55]

This court deems the language "earned and received" ambiguous because it is reasonably susceptible of different interpretations. AMA asserts that "earned and received" are two necessary elements and plaintiff's entitlement only vests when both elements coalesce during the effective term of the 2001 contract. Not surprisingly, plaintiff maintains a different interpretation of "earned and received". Plaintiff contends that income is "earned" upon the acceptance by the college of the underwriting proposal. According to plaintiff, when the proposal is accepted it was the intent of the parties to

52. *Id.*

53. *Resolution Trust Corp. v. Urban Redevelopment Authority of Pittsburgh,* 536 Pa. 219 at 225-26, 638 A.2d 972 at 975 (1994).

54. *Id.*

55. See pl.'s exhibit no. 3.

acknowledge his future entitlement to compensation for income that would eventually flow from that accepted proposal. Plaintiff concedes, however, that AMA's duty to compensate him for that income exists only once AMA actually "receives" the income. Plaintiff's interpretation of "earned and received" essentially amounts to accrual-based compensation.[56]

The evidence supports plaintiff's construction of "earned and received". Since the language is ambiguous, it is appropriate for this court to examine the accepted practices of the parties to ascertain their intentions. First, the parties concede that there was a delay between when policies were effective and the payment of premium income to AMA.[57] As a result, AMA's internal accounting was done on an accrual basis; from September to August.[58] Following the collection of all premium income by AMA for the preceding school year, it was the custom of the parties to convene each September to tabulate plaintiff's final compensation.[59] Accordingly, the intent of the parties was to compensate plaintiff for the performance of his 2003 underwriting services upon AMA's receipt of income attributable to that performance pursuant to the 2001 contract, even if the 2001 contract had expired.

In determining whether a failure of performance is material, consideration is properly given to the following

---

56. "Generally, under an accrual method, income is to be included for the taxable year when all the events have occurred that fix the right to receive the income and the amount of the income can be determined with reasonable accuracy." 26 Fed. Reg. §1.446-1.

57. CT 1 p. 12 lines 18-25; p. 13 lines 1-7.

58. CT 1 p. 13 lines 10-24; p. 20 lines 16-25.

59. CT 1 p. 20 lines 22-25; p. 21 lines 1-2.

factors: (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for that part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; (e) the extent to which the behavior of the party failing to perform or offer to perform comports with standards of good faith and fair dealing.[60]

AMA materially breached the 2001 contract by withholding compensation that plaintiff was entitled to under the 2001 contract. Arguably, the sole incentive for plaintiff's execution of the 2001 contract was financial gain. Moreover, AMA's failure to perform is not justified by any evidence of record. In determining that AMA's failure to compensate plaintiff constitutes a material breach, the court considered that: (a) plaintiff reasonably expected to be compensated for his services rendered; (b) plaintiff can be adequately compensated for his 2003 underwriting efforts; (c) AMA will not suffer forfeiture by compensating plaintiff; (d) AMA's assertion that plaintiff is entitled to no further compensation for his 2003 underwriting efforts suggests that plaintiff will likely not receive the compensation to which he is entitled without the court's intervention; (e) AMA's conduct does not comport with standards of good faith and fair

---

60. *Oak Ridge Construction Co. v. Tolley,* 351 Pa. Super. 32 at 41, 504 A.2d 1343 at 1348 (1985) (adopting Restatement (Second) of Contracts §241).

dealing. Upon consideration of the foregoing factors, this court finds that AMA materially breached the 2001 contract.

The intention of plaintiff and AMA in executing the 2001 contract, as demonstrated by their accepted practices, was to compensate plaintiff for his performance on an accrual basis. AMA's failure to compensate plaintiff for income it received after December 31, 2003 attributable to his 2003 underwriting efforts runs contrary to that intention. Therefore, AMA's failure to compensate plaintiff $121,912, to which he is entitled under the 2001 contract, constitutes a material breach of the 2001 contract.

## B. This Court Finds That AMA Did Not Breach the 2004 Contract

Pursuant to the rule stated in section A, *supra,* AMA did not breach the 2004 contract. The dispute arises from plaintiff's contention that he is entitled to further compensation under the 2004 contract for his performance in 2004 calendar year. The 2004 contract provides:

"*Weekly draw.* As compensation for [plaintiff]'s performance of the [underwriting] services, AMA shall pay [plaintiff] a weekly draw of $2,307.70 for each week during the term of this agreement. [Plaintiff]'s weekly draw shall be applied against his bonus and if the amount of the bonus is less than the draw which was paid, no additional payment shall be due; however, [plaintiff] shall not be liable to reimburse AMA for any such excess payment."[61]

---

61. See deft.'s exhibit no. 4 at ¶2(a).

Plaintiff asserts that AMA assigned excessive expense allocations to his accounts, and that his accounts produced income for AMA for which he is entitled to a bonus. AMA contends that it correctly attributed all income received through December 31, 2004 to plaintiff. This court agrees with AMA. Plaintiff has proffered insufficient evidence to support the contention that he is entitled to additional compensation. After applying expenses and plaintiff's draw of $95,538.70 for seven months work, in addition to $24,000 advance already paid to plaintiff, against the income received by AMA for all of 2004, AMA was correct in calculating that no additional bonus was due plaintiff.[62]

The plaintiff was not under duress when he executed the 2004 contract. Duress has been defined as that degree of restraint or danger, either actually inflicted or threatened and impending, which is sufficient in severity or apprehension to overcome the mind of a person of ordinary firmness.[63] The record is devoid of any evidence that suggests plaintiff was restrained or apprehended any degree of danger rising beyond the threat of pecuniary injury. Plaintiff admits that he was under no pressure other than the impending threat of unemployment to execute the 2004 contract.[64] Therefore, plaintiff was not under duress when he executed the 2004 contract.

Plaintiff has failed to prove that the 2004 contract was executed under duress, or support his mere assertions of AMA's excessive charges with credible evidence. There-

62. See deft.'s exhibit no. 5. January 28, 2005 letter from AMA to Robert Lucciotti.

63. *Carrier v. William Penn Broadcasting Co.*, 426 Pa. 427, 233 A.2d 519 (1967).

64. CT 1 p. 57 lines 24-25; p. 58 lines 1-2.

fore, plaintiff has failed to prove that AMA breached the 2004 contract.

## C. This Court Finds That the Restrictive Covenant in the 2004 Contract Is Invalid and Unenforceable, But Plaintiff's Damages Are Too Speculative To Be Recoverable

In order to be enforceable, restrictive covenants must satisfy three requirements: (1) the covenant must relate to either a contract for the sale of good will or other subject property or to a contract of employment; (2) the covenant must be supported by adequate consideration; and (3) the application of the covenant must be reasonably limited in both time and territory.[65]

Where a restrictive covenant is executed subsequent to the initial employment, its performance will not be enforced unless the employee who restricts himself receives a corresponding benefit or change in status.[66] The mere continuation of employment does not constitute adequate consideration for a restrictive covenant.[67]

The restrictive covenant at issue is invalid and unenforceable for want of adequate consideration. Since the restrictive covenant was executed subsequent to plaintiff's initial employment, adequate consideration could have been constituted by plaintiff's enjoyment of a cor-

---

65. *Maintenance Specialties Inc. v. Gottus,* 455 Pa. 327, 331, 314 A.2d 279, 282 (1974); *Hess v. Gebhard & Co. Inc.,* 570 Pa. 148, 808 A.2d 912 (2002).

66. *Gottus,* 455 Pa. at 330, 314 A.2d at 279.

67. *George W. Kistler Inc. v. O'Brien,* 464 Pa. 475, 347 A.2d 311 (1975) (rejecting lower court's view that employment itself constituted consideration as past consideration); *Arthur J. Gallagher & Co. v. Reisinger,* 2007 WL 1877895 at 9 (W.D. Pa. 2007).

responding benefit. The evidence and the 2004 contract clearly indicate, however, that if execution of the 2004 contract was designed to change plaintiff's status at all, it served to diminish it. The compensation formula in the 2004 contract recites an expense ratio absent in plaintiff's preceding contracts that apportions a higher cost to plaintiff for daily operations.[68] Since neither plaintiff's continuation of employment nor his diminished status constitutes adequate consideration for the subject restrictive covenant, the subject covenant is unenforceable.

Geographically unlimited restrictive covenants militate against enforcement because they indicate an intent to oppress the employee and/or to foster a monopoly, either of which is an illegitimate purpose.[69] Our law permits equitable enforcement of restrictive covenants only so far as reasonably necessary for the protection of the employer.[70]

Finally, the third element of an enforceable restrictive covenant, reasonableness of time and territory is absent in the subject covenant. Reasonableness in the instant case depends on whether the covenant was aimed at protecting of AMA's legitimate business interests. Execution of the restrictive covenant purports to limit plaintiff during his relationship with AMA and for two years thereafter "within any portion of the United States (and any other geographic area AMA expands into)."[71] Such a broad territorial constraint was unnecessary for the protection of AMA's legitimate business interests because plaintiff brought many accounts, clients, and contacts

68. See deft.'s exhibit no. 4 at ¶2(c)(5).

69. *Sidco Paper Company v. Aaron,* 465 Pa. 586, 351 A.2d 250 (1976).

70. *Id.*

71. See deft.'s exhibit no. 4 at ¶5(a). Restrictive covenant.

from across the country with him when he began working for AMA.[72]

The breach of restrictive covenants necessarily involves damages which are difficult to calculate with absolute precision. However, a mere possibility that the plaintiff might have made a profit if the defendant had kept his contract will not justify damages based on the assumption that a profit would have been made.[73] What the law does require in cases of this character is that the evidence shall with a fair degree of probability establish a basis for the assessment of damages.[74]

Plaintiff claims he sustained $149,000 in economic losses when prospective clients withdrew their "expressed interest" in working with him upon their receipt of AMA's letter informing them of the pending restrictive covenant.[75] Such a contention, without further evidentiary support, does not with a fair degree of probability establish a sufficient basis for the assessment of damages.

Accordingly, this court finds that the restrictive covenant imposed upon plaintiff by execution of the 2004 contract is invalid and unenforceable because it lacks adequate consideration and is unreasonable in territorial scope. However, plaintiff has failed to submit evidence on which to establish a sufficient basis for the assessment of damages, and therefore is not entitled to recovery.

Wherefore, it is the verdict of this court that judgment is entered in favor of the plaintiff and against the defendant in the amount of $121,912.

---

72. CT 1 p. 6 lines 14-22.

73. *Aiken Industries Inc. v. Estate of Wilson,* 477 Pa. 34 at 42, 383 A.2d 808 at 812 (1978).

74. *Id.*

75. See deft.'s exhibit no. 9. Damages of Robert Lucciotti.