515 A.2d 507

**Robert J. RUSISKI and Margaret M. Rusiski,
his wife, Appellees,**

**v.**

**Edward M. PRIBONIC and Andrea E. Pribonic,
his wife, Appellants.**

Supreme Court of Pennsylvania.

Argued Sept. 18, 1985.

Decided Sept. 25, 1986.

384

Stanley A. Uhr, Pechner, Dorfman, Wolffe, Rounick & Cabot, Philadelphia, for appellants.

Robert A. Seewald, Louis B. Swartz, Seewald, Carb & Swartz, P.C., Pittsburgh, for appellees.

Before NIX, C.J., and LARSEN, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

PAPADAKOS, Justice.*

The Appellants are the fee-simple owners of a fifty-acre tract in White Oak Borough, Allegheny County. They entered into an Agreement of Sale with the Appellees in which they agreed to sell the house in which they lived with its attendant outbuilding on a two-acre plot carved from their fifty-acre tract. The house and outbuildings in their intended geography were landlocked. To sell, therefore,

* Reassigned to this writer on July 28, 1986.

they offered access across their remaining land to the public roadway.

In the Agreement of Sale, that intention was embodied as follows:

> Sellers agree at the time of the conveyance to grant buyers a right of way which includes roughly the last sixty feet of the driveway, leading from the acreage to McKee Road. This right of way is to be granted in the deed and is to be used solely by the buyers for purposes of ingress and egress and it is clearly understood that the owners may, from time to time, use this portion of the land for water lines, sewer lines, electrical lines, gas and other utility functions.

Both parties agreed and signed. A deed, prepared by the Lawyers Title Insurance Corporation for and signed by Appellants, was presented at settlement and contained, as agreed, a deeded provision establishing the access road. It reads, in pertinent part:

> ALSO, together with a right in the grantees, their heirs and assigns, to use a driveway as presently located on property of grantors immediately abutting the premises herein described on the North for egress and ingress to McKee Road provided that grantors, their heirs and assigns, hereby reserve the right to use the property over which the driveway runs for water lines, sewer lines, electrical lines, gas and other utility functions so long as said reservation does not interfere with grantees' right of ingress and egress.

At settlement, which the Appellants did not attend, a dispute arose over whether, in the original agreement, the term "owners" referred then to the "buyers" or "sellers." The gravamen of the dispute was whether the ground in which the easement inhered belonged to the "sellers" or the "buyers," that is, whether the buyers owned the ground and granted an easement to the sellers, or the sellers owned the ground and granted an easement to the buyers. Appellants' counsel, to obviate the problem, struck from the deed provision the following:

... provided that grantors, their heirs and assigns, hereby reserve the right to use the property over which the driveway runs for water lines, sewer lines, electrical lines, gas and other utility functions so long as said reservation does not interfere with grantees' right of ingress and egress.

Hence, leaving the part that reserved ownership in the sellers and an easement in the Appellee-buyers.

It was the 11th hour and the buyers, faced with different wording, asked time to consider and evaluate the deletion. Three days thereafter, they agreed to the deletion, accepting the easement and not the ownership as was so plainly stated in the original Agreement of Sale. We say plainly stated because, when the Agreement of Sale was executed, the buyers were not then the owners, and no reading of that agreement could fail to distinguish that Appellants were then owners-sellers granting an easement over their land to the Appellees as buyers.

The problem here, however, does not turn upon that issue, because whatever the Appellant-sellers intended was agreed to by the Appellee-buyers. After the Appellee-buyers notified their acceptance to Appellants, they set a new closing date exactly one month after the original closing. The Appellants failed to appear, contending that the buyers breached the Agreement of Sale by refusing to close on the original settlement date. Three days later, the Appellees filed the instant suit seeking specific performance.

The Chancellor not only granted specific performance, but he also awarded damages of $48,852.00 reduced to present value of $31,441.64. He reduced the purchase price from $63,900.00 to $32,458.36 and added thereto $14,300.00, which the parties agreed was the value of improvements made to the property by Appellants after the signing of the agreement. Thus, the buyers were granted specific performance and were obligated to pay $46,758.36 instead of $78,200.00.

The Chancellor accomplished this arithmetic feat by presuming that the Appellees would have to overpay their

mortgage interest by 5% for a period of twenty years. At the original closing date, the buyers had obtained a twenty-year mortgage for $57,500.00 at 10.25% interest. Four years later, when the Chancellor issued his decree, the interest rate available was 15.25%. On appeal, the Superior Court affirmed.

Upon petition, we granted allocatur to consider both aspects of the lower court's decision. The precise issues on appeal are: 1) whether a seller who drafts an agreement of sale containing an ambiguity should be estopped from refusing conveyance when the buyer agrees within a reasonable amount of time to accept seller's interpretation; and 2) whether an equity court can award damages to a buyer in a land sales transaction calculated upon an increased mortgage interest rate.

## I.

In support of their appeal, the Appellants offer several arguments. First, they contend that there was ambiguity in the original agreement; because of this there was no meeting of the minds and, hence, no enforceable agreement. Second, Appellants argue that the tendered deed was a valid offer, which refused, was a rejection of the contract, and that the buyers' attempted acceptance of that offer was late and, hence, not binding. Finally, with regard to the Chancellor's apportionment of damages, they assert that the use of an increase in the annual mortgage percentage rate to penalize them was inequitable.

The scope of review of this Court in consideration of an appeal from a final decree is well established.

... the findings of the Chancellor will not be reversed unless it appears that he has clearly abused his discretion or committed an error of law. Where credibility of witnesses is important to the determination, the Chancellor's findings are entitled to particular weight because of his opportunity to observe their demeanor. Where a reading of the record reasonably can be said to reflect the conclusions reached by the Chancellor, a reviewing court may

not substitute its judgment for that of the Chancellor. A reviewing court, however, is not bound by findings which are without support in the record or have merely been derived from other facts. (Citations omitted.)

*Frowen v. Blank,* 493 Pa. 137, 142, 425 A.2d 412, 415 (1981).

Sellers principally contend that the term "owners" in the agreement created an ambiguity which necessitated rescission of the contract. Buyers, on the other hand, contend that there was no such ambiguity.

■ The intent of the parties to a contract is to be determined solely from the express language contained therein. *Steuart v. McChesney,* 498 Pa. 45, 444 A.2d 659, 661 (1982). We have already noted that the original agreement was plain enough to distinguish the parties and their intention. The learned Chancellor succinctly resolved that issue.

It is clear to the court that the purpose of the disputed language in the deed and Agreement of Sale was to grant ingress and egress to the plaintiffs but reserve a right in the defendant for water lines, sewer lines and other utilities in case defendants, at some future date, decided to develop the surrounding acreage. The clause in question does not make sense otherwise.

Slip opinion, GD 79–9621. Adjudication, p. 3 (7/2/81). The Superior Court, agreeing, stated:

Taking the provision in its context in the deed, it is illogical to interpret "owners" as referring to Rusiki's (sic) (Appellee-buyer) as they "owned" nothing prior to passage of title by deed.

*Rusiski v. Pribonic,* 326 Pa. Superior Ct. 545, 552, 474 A.2d 624, 628 (1984).

■ We agree with both analyses, for, assuming arguendo that there was ambiguity, doubtful language is construed most strongly against the drafter thereof. *In re Estate of Breyer,* 475 Pa. 108, 116, 379 A.2d 1305, 1310 (1977). In this case, it is undisputed that the Appellants drafted both the Agreement of Sale and the deed provision.

■ Moreover, sellers' contention, if accepted, would only support a finding of unilateral mistake, which, in the absence of fraud or fault attributable to the buyers, would not be grounds for rescission. See, *Bosler v. Sun Oil Co.*, 325 Pa. 411, 190 A. 718 (1937). See also, *Herman v. Stern*, 419 Pa. 272, 280 n. 5, 213 A.2d 594, 598 n. 5 (1965); *McFadden v. American Oil Co.*, 215 Pa. Superior Ct. 44, 257 A.2d 283 (1969). Neither fraud nor fault is at issue here.

■ Sellers further contend that since time was of the essence concerning the agreement, buyers were in breach upon their failure to close on the initial date set between the parties. This contention has no merit. The agreement at issue contains a paragraph that in order for time to be of the essence, written notice must be served upon the other party setting a date, time, and place for final settlement. This was not done by sellers. "It is a well-established principle in equity that time is not ordinarily regarded as of the essence in contracts for the sale of real property unless it is so stipulated by the express terms thereof, or it is necessary to be implied so." (Citations omitted.) *Carsek Corp. v. Stephen Schifter, Inc.*, 431 Pa. 550, 554–55, 246 A.2d 365, 368 (1968).

■ Additionally, delay in the instant case was precipitated by the actions of the sellers. Buyers were at all times ready to bargain and even agreed to accept sellers' interpretation of the disputed easement provision within a reasonable amount of time following the aborted first closing. A contract will not be nullified due to the intentional forebearance by one party to complete the conveyance.

Thus, we agree with the lower court that an enforceable contract existed, and that Appellees were entitled to compel performance.[1]

1. We note ᴛʜᴀᴛ Appellant's challenge to the lower court's order and decree are directed to whether an enforceable contract existed. There is no contention in their statement of the issue and/or their brief that assuming the existence of a valid contract, specific performance was not a proper remedy. Therefore, we need not address that issue.

## II.

We now turn to the second issue, concerning the damage calculations utilized by the Chancellor. The benchmark for reviewing a chancellor's findings in equity is based on the finding of an abuse of discretion or error of law. See, *Frowen, supra,* 5. It has further been held "that the function of this Court on an appeal from an adjudication in equity is not to substitute its view for that of the lower court; our task is rather to determine whether a judicial mind, on due consideration of all the evidence, as a whole, could reasonably have reached the conclusion of the chancellor." (Citations omitted.) *Aiken Industries, Inc. v. Estate of Wilson,* 477 Pa. 34, 39, 383 A.2d 808, 810 (1978).

It is incumbent that this Court analyze cases with an independent, judicial mind, where, as here, the specific issue is one of first impression within this Commonwealth.

The record clearly shows that when Appellees and Appellants entered into a sales agreement for the subject property in 1979, the agreement was subject to Appellees obtaining a mortgage at 10.25 percent over a twenty year period. Because of Appellants' 1979 breach, Appellees argued to the Chancellor that they lost the opportunity to borrow at 10.25 percent and, because of fluctuations in the interest rates, would have to pay 15.25 percent in interest (the average interest rate current in 1982, when the Chancellor issued his decree). The Chancellor agreed that Appellees suffered a loss, determining that the 5 percent in additional interest would cost them an additional $48,852.00 over a twenty-year period (the life of the mortgage). Reducing the figure to its present worth ($31,441.64), the Chancellor applied this to the purchase price as increased by subsequent improvements ($63,900.00 purchase price plus $14,300.00 improvements equals $78,200.00 less $31,441.64, the increased cost of interest) reducing the purchase price to $46,758.36.

■ While we have never had occasion to discuss whether the increased interest rates are awardable elements of consequential damages, our general rule is that consequen-

tial damages may be awarded as collateral relief to a decree of specific performance, since the power of a chancellor extends to shaping and rendering a decree which accords with the equities in the case. *Sigal v. Manufacturer's Light & Heat Co.,* 450 Pa. 228, 299 A.2d 646 (1973); *Township of Salisbury v. Vito,* 446 Pa. 200, 285 A.2d 529 (1971); *Dombrowski v. City of Philadelphia,* 431 Pa. 199, 245 A.2d 238 (1968).

■ However, these damages must be such as would naturally and ordinarily follow from the breach, must have been reasonably foreseeable and within the contemplation of the parties at the time they made the contract and must be capable of being proved with reasonable certainty. *Keystone Diesel Engine Company v. Irvin,* 411 Pa. 222, 191 A.2d 376 (1963); *Adams v. Speckman,* 385 Pa. 308, 122 A.2d 685 (1956); *Taylor v. Kaufhold,* 368 Pa. 538, 84 A.2d 347 (1951).

This requirement necessarily flows from the nature of the jurisdiction of the court when decreeing the specific performance of a contract, which is to confirm the contract, and erase the breach, and to restore the parties as nearly as possible to the positions they occupied before the breach. The original time for performance having passed, the court, in order to relate the performance back to it, must equalize any losses occasioned by the delay by offsetting them with money payments. In balancing the equities between the parties, however, the claimed damages must be capable of being proved with reasonable certainty, and this requirement extends to a claim for interest rates. From even a cursory review of this record, the relief that will put Appellees in the position they were before the breach is incapable of sure prediction. In 1979, the Appellees obtained financing at 10.25 percent interest. When they appeared before the Chancellor in 1982, they had not obtained financing, but relied on the then current interest rate of 15.25 percent as a measure of their damage if specific performance were or-

dered at that time. Currently, interest rates are at 10.50 percent and appear to be falling.

Because of the drastic fluctuations in interest rates over the recent past, it is speculative for a court to award interest as damages in specific performance decrees. Such decrees do not usually take effect until sometime in the future, when all appeals are exhausted, and cannot anticipate or reflect the continual changes of interest rates. Thus, actual damages are not capable of being awarded. To prove the point, reference need only be made to this case. As the matter stands, Appellees are being overcompensated by this decree, at the expense of Appellants, who are only required to compensate Appellees for the losses actually sustained by them.

The evidence accepted by the Chancellor establishes that the cost of the mortgage to Appellees over a twenty (20) year period at 10.25 per cent per annum repayable at $564.65 per month, principal and interest, would be $135,516.00. The same mortgage at 15.25 per cent per annum repayable at $768.20 per month, principal and interest, would aggregate $184,368.00. This represents an increased cost of $48,852.00 over the term of the mortgage. Reduced to present value this increased cost is $31,441.64 and it was charged to the Appellants by reducing the purchase price. Unwittingly, the Chancellor caused an unjust enrichment.

The monthly payment of $564.65 (for which Appellees had bargained) would have gotten them a mortgage of $42,500.00 at 15.25 per cent per annum for a term of twenty (20) years. Since they had bargained for a mortgage of $57,500.00 their true loss could only be the difference of $15,000.00 which, when subtracted from the purchase price of $63,900.00 plus improvements of $14,300.00 ($78,200.00) leaves a balance of $63,200.00 still owing to Appellants. This is a loss of $700.00 and not $31,441.64 as awarded by the Chancellor.[2]

2. The Buyers' loss could also have been eliminated by the Sellers taking back a purchase money mortgage as bargained for by the Buyers.

By awarding Appellees damages of $31,458.36, the Chancellor, in effect, reduced the purchase price from $63,900.00 to $32,458.36. He then added the cost of the improvements ($14,300.00) which remain unaffected by the breach. This placed the Appellees in a position where they were only required to obtain a mortgage of $26,000.00 at 15.25 per cent interest since they had $6,400.00 in cash to apply to the purchase price. At a monthly principal and interest payment of $347.18 for twenty (20) years their payback would be $83,323.20 instead of $135,516.00 for which they had bargained. This is a savings to them of $52,192.80 over the term of the mortgage and not a loss of $48,852.00 over the term of the mortgage as found by the Chancellor. This is not only unjust enrichment. It is also unwittingly unconscionable.

Finally, it must be noted that the average life of a residential mortgage is 11.79 years.[3] Many events occur which cause payments of mortgages to be accelerated. The properties are sold, and the mortgages are paid off. The owners become more affluent and increase their principal payments. The properties are sold at sheriff sale upon default. The properties are destroyed by a catastrophe—fire, flood, tornado and the like—and insurance pays off the mortgage. Interest rates drop and the properties are refinanced thus causing a payoff of the original mortgage. Or refinancing occurs for any other reason and the original mortgage is paid off. We would look a little silly today if the Chancellor's Decree had been fulfilled and Appellees today would be refinancing the debt at today's rates of interest of ten to eleven per cent. What a windfall *equity* would have bestowed upon them.

Because of all these imponderables, damages must never be awarded unless they can be ascertained with reasonable certainty. In this case the only damages suffered by Appellees by the breach and which can be ascertained with reasonable certainty are the increases in closing

3. February 1, 1985, issue of *Real Estate Finance Today.*

costs occasioned by the passage of time. We know what the closing costs were on April 9, 1979, and we will know what they are when the parties close. The difference should be reimbursed to Appellees by the Appellants. *Equity* can do no more for the parties than do equity to *each* party.

Reversed and remanded to the Court of Common Pleas of Allegheny County with directions to enter a decree of specific performance in conformance with this opinion.

FLAHERTY, J., did not participate in the consideration or decision of this case.

NIX, C.J., concurs in the result.

McDERMOTT, J., files a concurring and dissenting opinion.

McDERMOTT, Justice, concurring and dissenting.

I join in the majority's conclusion that an enforceable contract existed. However, as to the rejection of the Chancellor's damage calculations, I dissent, since the majority has made a serious error in ignoring the equity status of the instant controversy and treating it as an action at law.

The Chancellor in equity has long been recognized as possessing the power to enter money judgments against parties if the circumstances of the specific case require it. *Meth v. Meth,* 360 Pa. 623, 626, 62 A.2d 848, 849 (1949). Furthermore, it is not the duty of a court in equity to apply strict legal principles in resolving disputes, but rather to use its sound discretion to adapt the relief to the circumstances of the particular case. *Commonwealth of Pennsylvania v. Williams,* 294 U.S. 176, 55 S.Ct. 380, 79 L.Ed. 841 (1935). *See also, Overfield v. Pennroad Corporation,* 42 F.Supp. 586, (E.D.Pa.1941); Pennsylvania Law Encyclopedia, *Equity* § 31.

In granting equitable relief this Court has held that "the appropriateness of a particular form of relief is to be tested by balancing the seriousness of the injury against the cost of avoiding it and the importance of the conduct causing it." (Citations omitted.) *Dexter v. Bebenek,* 458 Pa. 1, 3, 327 A.2d 38, 39 (1974).

The majority has eschewed these equitable principles and decided this matter as if it were an action at law, choosing for support prior assumpsit actions [1] rather than equity actions, and applying legal restrictions on damages such as foreseeability and certainty of loss. This type of legal analysis ignores the traditional distinction established by this Court in addressing the problems unique to equity and law.

Additionally, I note that a method of calculation identical to the one used by the Chancellor in the case at bar has been approved by other jurisdictions. *See Reis v. Sparks,* 547 F.2d 236 (4th Cir.1976) (applying Maryland law); *Walker v. Benton,* 407 So.2d 305 (Fla.App.1981); *Donovan v. Bachstadt,* 91 N.J. 434, 453 A.2d 160 (1982).

In conclusion, I believe that the majority's reliance on the foreseeability and certainty of damages is misplaced. It should be this Court's responsibility to analyze whether the Chancellor has abused his discretion in assessing consequential damages. Given the fact that appellants were aware of the appellees' plans to finance the purchase at a specific mortgage percentage rate, and that the appellants unreasonably refused to make the conveyance, I do not believe the Chancellor stepped outside his equitable powers by devising the contested formula in an effort to cure this conflict.

Accordingly, I dissent.

1. *See Keystone Diesel Engine Company v. Irwin,* 411 Pa. 222, 224, 191 A.2d 376, 378 (1963), and cases cited therein.