## Mid-State Markets Inc. v. Jackson

*Charles A. Bierbach,* for plaintiff.

*Susan M. Yarnall* and *Charles B. Swigart,* for defendants Detwiler Enterprises Ltd., Ruth Ann Jackson and Joseph Detwiler.

*John McNaight Cramer,* for defendant Great Atlantic and Pacific Tea Company Inc.

TAYLOR, *P.J.,* April 19, 1991—Plaintiff, Mid-State Markets Inc., commenced this action through the filing of a complaint for declaratory judgment on March 6, 1990. On April 4, 1990, defendant Detwiler Enterprises, Ltd. filed its answer and new matter. On that same date, defendant The Great Atlantic and Pacific Tea Company Inc. also filed its answer and new matter. Plaintiff filed a reply to each new matter on May 21, 1990. Gateway Foods Inc. has not participated in this action.

On August 6, 1990, plaintiff filed a motion for summary judgment. Briefs were timely filed by all parties and oral argument on said motion was held on April 8, 1991.

## FACTUAL BACKGROUND

On February 24, 1967, A&P as lessee entered into a lease with Charles S. Detwiler as lessor for premises located at 902-914 Moore Street, Huntingdon, Pennsylvania. The rights of the lessor were subsequently assigned to Joseph Detwiler, Ruth Ann Jackson and R. Arlene Detwiler, his two children and his wife, by an assignment of lease agreement dated October 2, 1972. By an agreement of sublease dated July 1, 1983, A&P sublet the premises to Reeves Parvin & Co. By real estate sublease dated as of February 16, 1986, Gateway Foods of Pennsylvania, who had purchased Reeves Parvin & Co., sublet the premises to plaintiff Mid-State Markets Inc. It is undisputed that privity of contract exists between Detwiler-Jackson as landlord and Mid-State as sub-sublessee.

The lease provides for a base rent plus additional rent in the amount of one percent of annual sales in excess of $2,790,000. Paragraph 35 of the lease deals with the percentage rent and provides as follows:

"The Lessee in consideration of the leasing of the premises aforesaid and the covenants and agreements herein contained does hereby pay to the Lessor, as additional rent for the demised premises during the term hereof, a sum per annum to equal 1 percent of the annual gross sales, in excess of $2,790,000 either cash or credit, whether by the Lessee or concessionaires, from business conducted on the leased premises, less sales tax, refunds, rebates, excise and cigarette taxes and returns to be computed and paid each year; but the Lessee shall pay said additional rental to the Lessor in monthly installments on the first day of each and every month during the term thereof.

"On or before the last day of the first month following the end of the first year of occupancy and each year thereafter of this lease, the Lessee shall submit to the Lessor a statement of the gross sales for such year, in a form satisfactory to the Lessor, and shall therewith pay to the Lessor the balance of the rental that may be determined to be due the Lessor for such year; that is, the actual rent for such year as provided above, less the minimum rental paid, should the actual rental so computed be less than the minimum rental paid, then such minimum rental so paid shall become the actual rental for the year. This process shall be repeated during and for each year of the term of this lease and the optional extensions herein provided in determining the rental to be paid to the Lessor for each year.

"The Lessee shall keep and shall require its licensees, concessionaires, sub-tenants, sublessees and assigns to keep books of account, in accordance with good accounting practice, of the business conducted on said leased premises, being a full and complete record of said gross sales for each lease year of the term hereof. Lessee shall give Lessor

access to any records or other information in its possession and will require its licensees, concessionaires, subtenants, sublessees and assigns likewise to give Lessor access to their records and information opportunity to check the same. Lessor, by accepting payments of rental based thereon, shall not be precluded thereby from later challenging the correctness of such statement or the amount of such additional rental."

By agreement dated June 5, 1987, Mid-State was authorized by the Commonwealth of Pennsylvania, Department of Revenue to sell tickets for the Pennsylvania lottery. The agreement with the Department of Revenue provides in paragraph 7 that Mid-State acts in a fiduciary capacity with regard to funds received from the sale of lottery tickets until the proceeds are paid into the state lottery fund. Mid-State is made personally liable for the proceeds from the sale of tickets and is required to provide security to the department. The department agrees to pay Mid-State a commission on sales of lottery tickets.

At issue in this case is whether A&P and the subtenants are required to pay percentage rent on the gross amounts paid for Pennsylvania lottery tickets or whether percentage rent need only be paid on the portion of the price of lottery tickets which is paid to Mid-State by the Commonwealth of Pennsylvania as a commission.

## DISCUSSION

The task before us is to interpret paragraph 35 of the written lease dated February 24, 1967. Defendant Detwiler would have us adhere to the well-settled principle that doubtful language in a contract is to be construed most strongly against its scriv-

ener, which was A&P. In support of this argument, defendant Detwiler cites *Rusiski v. Pribonic,* 511 Pa. 383, 515 A.2d 507 (1986), and *Village Beer and Beverage Inc. v. Vernon D. Cox and Co. Inc.,* 327 Pa. Super. 99, 475 A.2d 117 (1984). While we do not quarrel with the fact that these cases stand for this proposition, we also point out that this principle in no way represents a "talismanic" solution to the interpretation of ambiguous language. *Burns Manufacturing Co. Inc. v. Boehm,* 467 Pa. 307, 356 A.2d 763 (1976). We believe that we are also under a duty to ascertain the intent of the parties at the time of execution of the lease and to give effect to that intention. *Bobali Corp. v. Tamapa Co.,* 235 Pa. Super. 1, 340 A.2d 485 (1975).

A lottery did not exist in 1967 when the lease was executed. Accordingly, it is not surprising that paragraph 35 is ambiguous on the subject. However, a reading of paragraph 35 plainly indicates that there were specific amounts collected in connection with sales that were not to be included within the definition of gross sales: sales tax, refunds, rebates, excise and cigarette taxes and returns.

Obviously, the above-noted exemptions were not considered to be property of the lessee and, as such, were not included in the calculation of gross sales. Clearly, it was recognized at the time of drafting that the lessee was simply a conduit or collection agent for such sums.

The amount plaintiff collects on lottery tickets beyond its commission is revenue due to the Commonwealth of Pennsylvania. Mid-State simply acts as a sales agent and derives a five-percent commission from such sales. This relationship, as well as the manner in which sales proceeds must be administered, is clearly set forth in the lottery sales agreement between Mid-State and the Common-

wealth. In applying the terms of this contract to the instant matter, it is evident that on this basis the amounts paid for lottery tickets are in no sense "gross sales" of plaintiff.

Our review of the law indicates that this issue is one of first impression in the Commonwealth of Pennsylvania. This issue has, however, been considered by the Appellate Court of Illinois in *Anest v. Bellino,* 151 Ill. App. 3d 818, 104 Ill. Dec. 861, 503 N.E. 2d 576 (1987). It is noted that the contract between the Illinois Lottery and its ticket sellers is very similar to the Pennsylvania Lottery Commission contract with Mid-State and other Pennsylvania lottery franchisers.

In holding in favor of the tenant, the Appellate Court discussed the meaning of gross sales:

"The phrase 'gross sales' is imprecise and its definition in a given case depends mainly upon the wording established by the contract. We hold that the finding by the trial court that all the money received by the restaurant from the sale of lottery tickets is to be included in gross sales was erroneous. Although the restaurant actually handled the money, that portion of the money belonging to the lottery system was not intended by the parties to be included in gross sales. Only the commissions and bonuses belong to the restaurant, and only those amounts increase the restaurant's sales. . ...

"While gross sales have no relation to profit, and while items which the lessee must pay from the gross sales and which reduce his profit may be included in gross sales, amounts which are not income to a lessee are not received by him within the meaning of gross sales. The money received from the sale of lottery tickets, minus the amounts retained by the lottery agent, temporarily come into

the possession of the lottery agent, but are not his property." *Anest,* 503 N.E.2d at 579-80. (citaitions omitted)

Identical considerations are present here. Aside from the commission, the amount received by plaintiff for lottery ticket sales comes into its possession but is not its property. In fact, as defendant A&P correctly points out, payment for lottery tickets cannot rightly be said to be in plaintiff's possession insofar as: (1) plaintiff must keep said funds in a separate checking account; (2) all proceeds other than commissions must be deposited in said account; (3) plaintiff holds said funds in a fiduciary capacity until they are paid to the Commonwealth; and (4) plaintiff is prohibited from commingling said funds with any other funds or assets.

We find the court's analysis in *Anest* to be persuasive and find it appropriate to apply the court's rationale in the instant matter. In light of the similarity of state lottery contracts and the factual situation in both cases, we believe that the same result should apply in Pennsylvania that occurred in Illinois.

In coupling the analysis set forth in *Anest* with our perceived intention of the parties as evidenced in excluding other related items from the computation of gross sales, we find plaintiff's motion to be meritorious. Accordingly, we grant plaintiff's motion for summary judgment and hold that amounts received from the sale of lottery tickets other than commissions paid to plaintiff do not represent gross sales for purposes of computing percentage rent under the lease at issue in this case.

The court would note that the provisions of 42 Pa.C.S. §§7533 and 7534 clearly give the court jurisdiction to decide this action which involves the

interpretation of a disputed contract provision. The matter involved was solely one of law. Counsel agreed there are no disputed facts. Counsel also agreed that they would have little difficulty calculating any rent due after the disputed contract interpretation was determined.

An order in accordance with this opinion will be entered.

## ORDER

Now, April 19, 1991, for reasons set forth in an opinion attached hereto, the court hereby grants declaratory judgment in favor of plaintiff, Mid-State Markets Inc., and against all defendants in accordance with 42 Pa.C.S. §§7533 and 7534 inasmuch as this action involves interpretation of a disputed contract provision. The court finds as a matter of law based on the facts in this case that only the commissions that Mid-State Markets Inc. receives on the sales of Pennsylvania lottery tickets may be calculated by the parties in the determination of gross sales of the business in determining the rent from the formula set forth in paragraph 35 of the February 24, 1967 lease for the subject premises in the 900 block of Moore Street, Huntingdon Borough, Huntingdon County, Pennsylvania.

The court notes only Ruth Ann Jackson and her brother, Joseph Detwiler, opposed the position of plaintiff. The Great Atlantic and Pacific Tea Company Inc. supported the position of plaintiff. Gateway Foods Inc. did not oppose it.

Record costs on Ruth Ann Jackson and Joseph Detwiler.