PNC BANK, Appellee,

v.

Steven KERR, Appellant.

Superior Court of Pennsylvania.

Argued March 19, 2002.

Filed June 25, 2002.

John P. Lacher, Pittsburgh, for appellant.

Donna M. Donaher, Pittsburgh, for appellee.

Before JOHNSON, BENDER and MONTEMURO *, JJ.

BENDER, J.

¶ 1 Steven Kerr (Appellant) appeals from the trial court's order that denied his Petition to Open and/or Stay Execution of a judgment by confession that PNC Bank (Appellee) obtained against Kerr, a guarantor of business loans on which the corporate borrower defaulted. Kerr raises six claims on appeal: five of which assert that the trial court erred by denying his petition, four of those respecting substantive law and one respecting timeliness; and one claim advancing the argument that the trial court erred by denying his collateral request for an accounting. Although we disagree with the trial court's finding that Kerr filed the petition untimely, we affirm the trial court's order denying relief under the petition.

* Retired Justice assigned to Superior Court.

¶ 2 From December 19, 1990 until April 3, 1991, PNC made a series of four loans, whose total principal amounts aggregated to $85,500 to Greater Pittsburgh Air Cargo, Inc. (GPAC). GPAC principals, including Kerr, signed companion guaranty agreements for all four loans. The loan documents also included standard provisions that permitted PNC, upon default, to confess judgment, pursuant to Pa.R.C.P. 2950–2959, against all responsible parties including Kerr. The loan documents also gave PNC, in event of default, the right to accelerate as due immediately the full principal balance, as well as the right to recover attorney fees that PNC incurred after any default.

¶ 3 On September 16, 1991, GPAC filed a Chapter 11 reorganization petition under the U.S. Bankruptcy Code. To further GPAC's reorganization, on November 4, 1991, the Bankruptcy Court authorized GPAC to borrow from PNC an additional $100,000 (the post-petition loan documents also contained authorizations for a confessed judgment in event of default) and reaffirmed the balances due to PNC under the four pre-petition loans. Kerr also guaranteed the $100,000 post-petition working capital loan.

¶ 4 Afterward, however, GPAC defaulted on its loans with PNC. PNC repossessed and sold three trucks that served as collateral for the first three pre-petition loans to GPAC. Since GPAC did not cure its default after the repossession sales, on March 21, 1994, PNC filed a complaint in confession of judgment against Kerr as guarantor of the loans. The complaint stated a total amount due, including principal, interest, attorney fees and costs, of $94,076.71. On the same date that PNC filed the complaint, the trial court mailed a notice of the judgment to Kerr. On December 6, 1994, PNC served Kerr with a Notice of Deposition and Production of Documents at Oral Examination for Discovery of Assets and Aid of Execution. On January 9, 1995, Kerr, having received notice, appeared for that deposition.

¶ 5 Two and one-half years later, on July 30, 1997, the parties signed a written Agreement Regarding Loans (ARL). PNC thereby agreed to discharge the $90,608.41 antecedent debt and mark the judgment satisfied if the "Borrower" (GPAC, and secondarily all guarantors including Kerr) complied with all provisions of the ARL. GPAC agreed to make 36 monthly payments of $1,285 each, and a final $6,000 balloon payment, with resulting total new consideration due of $52,260 on or before July 31, 2000. The ARL provided for an alternate "Lump Sum Payment Option" (LSPO). It allowed GPAC to discharge its debt to PNC, if it had not previously defaulted on the ARL's monthly payments or other terms, by paying, on or before July 31, 1999, a lump sum that, together with earlier monthly payments, would equal a $41,000 total.

¶ 6 Additionally, the ARL provided: "5.3 *Bank Accounts.* The Borrower and the Guarantors and any of them shall maintain all of their bank accounts at PNC Bank." Kerr, however, maintained an account at Dollar Bank with a balance exceeding $150,000. At a later deposition Kerr stated that, while he held that account in his name, the money therein belonged to his daughter.

¶ 7 The ARL also expressly provided:

5.6 *Maintenance of Assets and Collateral.* Borrower will maintain their properties and assets in good order and will do all things necessary to cause Bank to obtain and maintain a perfected security interest in all collateral required or contemplated in this Agreement.

The Security Agreement that accompanied the ARL contained a similar provision. However, on November 13, 1998, GPAC

sold all its assets to Total Transportation Corporation, an outside corporation not a party to these proceedings or to any agreements that GPAC and the Guarantors, including Kerr ("Borrower parties") had with PNC. GPAC gave PNC no notice of the assets sale and disbursed a significant amount of the $350,000 sale proceeds to Kerr.

¶ 8 After the 1998 assets sale, GPAC, since it had essentially stopped doing business, also stopped making payments to PNC under the ARL. Kerr then had simultaneous financial difficulties with the U.S. Department of the Treasury, the Internal Revenue Service (IRS), and with Ohio state court litigation; there the court found Kerr personally liable for $100,000 in business obligations not related to the instant case.

¶ 9 After GPAC defaulted on the ARL, the parties continued to negotiate. The parties for a time disputed the total amount of payments PNC had received. Mainly, they did not agree on a specified amount of additional payments that the Borrower parties could make and that PNC would accept to end the matter. Failing agreement, PNC sent notice of default under the ARL to Kerr on November 15, 1999, and again on December 22, 1999. On January 18, 2000, PNC filed a Praecipe for Writ of Execution on a Confessed Judgment. The Praecipe demanded $80,487.85 plus interest and costs from January 18, 2000 forward. PNC computed its demand under the original loans; upon default, the ARL's acceleration clause reinstated the original loans.

¶ 10 On February 17, 2000, Kerr filed a Petition to Open and/or Stay Execution. As a key part of the petition, Kerr argued that, because GPAC had, as of that date, paid $27,400 to PNC under the ARL, he had the right to pay off PNC by tendering a final payment of $13,600 (the $41,000

LSPO amount minus the $27,400 already paid). Kerr stated that he had that right despite the passing of the July 31, 1999 date, because the LSPO provision had no "time is of the essence" clause.

¶ 11 On February 16, 2001, the trial court denied Kerr's Petition to Open Judgment and/or Stay Execution, and on February 26, 2001, Kerr filed a Motion for Reconsideration of the trial court's order denying the petition. The trial court denied that motion on March 2, 2001. PNC garnished funds in the full amount of the writ and filed a Satisfaction on March 15, 2001.

¶ 12 On March 16, 2001 Kerr filed the instant appeal. He argues that:

1) The trial court erred by denying the petition because the LSPO clause of the ARL had no "time is of the essence" clause.

2) The trial court erred by denying the petition because the parties' continuing negotiations after the July 31, 1999 LSPO due date established Kerr's material compliance with the ARL.

3) The trial court erred by denying the petition because it misinterpreted the "notice and cure" provisions of the ARL as they applied to the July 31, 1999 LSPO due date.

4) The trial court erred by denying the petition because, for all of the first three stated reasons, Kerr materially complied with the ARL.

5) The trial court erred by denying Kerr's request for an accounting.

6) The trial court erred by finding Kerr's petition untimely.

¶ 13 Preliminarily, we note PNC's argument that, because the petition has the aspect of a request to stay or vacate the writ of execution, as well as to open the judgment, Kerr does not have the right to appeal the trial court's order to that ex-

tent. PNC argues that such a petition necessarily has a basis outside the record and, thus, appellate courts lack jurisdiction.

¶ 14 In *National Council of Junior Order of United American Mechanics v. Roberson*, 214 Pa.Super. 9, 248 A.2d 861 (1969), we did indeed hold that an appellate court lacks jurisdiction to review a petition to stay a writ of execution to the extent that a petitioner bases a petition on averments as to facts outside the record. In the instant case, however, PNC does not specify what averments to facts outside the record Kerr made when filing and prosecuting his petition. The petition makes, of record, several factual averments that Kerr relies on to advance the petition. Without providing specific detail as to Kerr's ostensible reliance on facts outside the record, we have no basis to find want of jurisdiction under *Roberson*. The trial court's order appears in all material respects to be a final order reviewable under Pa.R.A.P. 341.

¶ 15 In reviewing a trial court's order on a petition to open a confessed judgment, we have the following standard of review:

> A petition to open judgment is an appeal to the equitable powers of the court. As such it is committed to the sound discretion of the hearing court and will not be disturbed absent a manifest abuse of discretion.

*First Seneca Bank & Trust Co. v. Laurel Mountain Development Corp.*, 506 Pa. 439, 443, 485 A.2d 1086, 1088 (1984). The *First Seneca* court also determined that a court acting in equity should open a confessed judgment only when the petitioner "acts promptly, alleges a meritorious defense and presents sufficient evidence of that defense to require submission of the issues to the jury." *Id.*

¶ 16 Therefore, we first consider the issue of the timeliness of Kerr's petition. The trial court found it untimely. Although each party briefs that issue last in sequence, if Kerr did not file the petition timely, he has no right to relief and we need not address any of the other appellate issues.

¶ 17 Appellant argues that Pa. R.C.P. 2956.1 requires a creditor who wishes to execute upon a confessed judgment to provide, to the defendant in the action to confess judgment, notice under one of a series of three rules, Pa.R.C.P. 2958.1–2958.3. Each of those rules allows a defendant, within 30 days after service of the required notice, to file a petition to open the confessed judgment. Because he filed the petition within 30 days of the notice PNC filed under Rule 2958.3, Kerr argues he filed the petition timely.

¶ 18 The trial court, however, found that Rule 2958.3, to the extent that it concerns timeliness requirements for filing a petition to open, does not apply to Kerr's case. On April 1, 1996, with an effective date of July 1, 1996, our Supreme Court amended and added several rules of civil procedure that concern confessed judgments, including the subject new Rule 2958.3. Since PNC confessed judgment before July 1, 1996, the effective date of the amendments, the trial court found that Kerr must establish that he filed the petition timely considering the state of the law before the effective date of the amendments. The trial court relied on an inference it drew from a footnote in our opinion in *Thomas Associates v. GPILTD, Inc.*, 711 A.2d 506, 508 n. 2 (Pa.Super.1998). The footnote states that because the creditor there had confessed judgment after the effective date of the amendments, the new rules applied. Since PNC confessed judgment before the effective date of the amendments, the trial court reasoned that

to apply the new rules would create an "absurd result." Trial court opinion (T.C.O.), 7/12/01, at 13. Because PNC confessed judgment in 1994 and Kerr did not file the petition to open until 2000, nearly six years later, the trial court found that Kerr did not act timely under the standards of *Wenger v. Ziegler*, 424 Pa. 268, 272, 226 A.2d 653, 655 (1967) ("One who petitions to open a confessed judgment must act promptly.").

¶ 19 The Civil Procedural Rules Committee wrote an Explanatory Comment to accompany those revised and new rules. Respecting notice provisions, the Comment stated an intent "to aid the bench and bar in complying with *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250 (3rd Cir.1994)." Explanatory Comment—1996 to Rule 2958.3. The plaintiffs in *Jordan* filed a suit under 42 U.S.C. § 1983 [1] when their lessor, acting through its attorneys, garnished funds in a bank account after obtaining a confessed judgment. The Third Circuit held that the then current Pennsylvania procedures for executions upon confessed judgments violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution. It specifically criticized, as had the District Court, the old provision that required a trial court prothonotary, upon praecipe from a plaintiff creditor, to issue forthwith a writ of execution without "a discretionary review and approval by a professionally competent official" and with no procedure to "guarantee a prompt post-seizure adjudication of a debtor's protest."

*Jordan*, 20 F.3d at 1270. Further, *Jordan* held that plaintiffs there made out a *prima facie* case of a 1983 violation by the lessor and its attorneys because defendants, under color of the constitutionally defective Pennsylvania procedures, "caused the state forcibly to deprive [plaintiff] of its property without the pre-deprivation notice and hearing due process requires." *Id.* at 1267.

¶ 20 The Explanatory Comment stated an "intent . . . to limit the necessity for hearings on issues of due process and waiver by providing the defendant with a pre-deprivation notice and opportunity for hearing on the merits." Explanatory Comment—1996 to Rule 2958.3. After discussing procedures that address due process, the Comment continues "[i]n all other instances, the issues upon a petition for relief from the judgment will be the merits. . . ." *Id.* To promote judicial economy, the new rules, although promulgated to comply with *Jordan's* holding concerning due process rights, consolidate under the new procedure all hearings on petitions to open confessed judgments. A defendant has 30 days after notice of execution to file a petition to open, as opposed to the pre–1996 standard of perceived timeliness that the trial court applied to Kerr's case.

¶ 21 We disagree with the trial court's ruling that applying the new rules to the instant case creates an "absurd result." *Jordan* found then current procedures to confess judgment constitutional, but found procedures for executing on confessed

1. The statute, in pertinent part, provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

judgments unconstitutional; thus the new rules use the notice of execution rather than the confession of the judgment as the trigger for filing a petition to open. In Kerr's case, PNC plainly stated that it filed the notice of execution under new Rule 2958.3. Execution, the key event under the new rules, occurred after the effective date of the new rules. As well, since the key event becomes execution not confession, the due process concerns behind adoption of the new rules seem equally valid in any case no matter how long the period between confession and execution.

¶ 22 Moreover, the decision in *First Seneca,* decided before adoption of the new rules, would also find Kerr's petition to open timely. *First Seneca* held that "[t]he crucial factor in determining whether a petition is timely is not the specific time which has elapsed but rather the reasonableness of the explanation given for the delay." *Id.* at 443, 485 A.2d at 1088. Although PNC confessed judgment in 1994, the parties kept negotiating. In 1997 they agreed to the ARL to resolve the default, and continued to negotiate up until the time PNC filed its writ of execution. Under those circumstances, Kerr did not sleep on the case for six years between confession and execution. His filing of the petition to open when he did seems "reasonable," whether under the rule of *First Seneca* or the new applicable Rule 2598.3. Thus, we disagree with the reasoning of the trial court and find Kerr's petition timely.

¶ 23 Kerr further argues that he advanced meritorious defenses of sufficiently compelling quality to justify granting his petition to open the confessed judgment and setting a jury trial. While he divides his argument into four separately stated grounds, Kerr essentially argues that he materially complied with the ARL. More specifically, Kerr argues that the ARL al-

lowed him to satisfy his obligation to PNC by paying, at the time PNC issued the notices of default under the ARL, $13,600 in additional consideration. That amount represents the difference between the LSPO of $41,000 and the $27,400 already paid. Kerr maintains that he may do so notwithstanding the passing of the July 31, 1999 stated due date for the LSPO. Kerr states three separate reasons behind his argument that the passing of the July 31, 1999 date did not toll his rights under the LSPO: a) the LSPO section of the ARL has no "time is of the essence" clause; b) his continuing negotiations with PNC after July 31, 1999, justified his failure to pay the $13,600 on or before July 31, 1999; and c) PNC failed to give notice of default before July 31, 1999. For those reasons, Kerr contends that his offer to tender to PNC $13,600 after PNC's notice of default materially complied with the ARL, and on that basis the trial court should have granted his petition to open.

¶ 24 The trial court found that Kerr did not comply with the ARL and had no meritorious defense that would justify granting his petition to open, or to stay execution of, PNC's confessed judgment. It found that the ARL's LSPO had clear and unambiguous terms to the effect that Kerr's right to discharge under the LSPO expired July 31, 1999, even without a "time is of the essence" ' clause. Further, the trial court found that the pendency of negotiations between the parties after lapse of the LSPO's July 31, 1999 due date "did not excuse Kerr's failures to meet any of his contractual duties, especially his duty to pay PNC on time." T.C.O., 7/12/01, at 7. The trial court further found that the ARL's notice provisions did not apply to the passing of the July 31, 1999 LSPO due date because "it is unreasonable for Kerr to suggest that PNC was required to give him notice of default *before* the condition precedent to that default." *Id.* at 9 (em-

phasis in original.) Additionally, the trial court found, contrary to Kerr's assertion that he materially complied with the ARL, that in fact Kerr materially breached the terms of both the ARL and his original agreements with PNC. The trial court found Kerr's breaches sufficiently material that Kerr violated the "clean hands" requirement for seeking equitable relief. As support for its finding, the trial court lists: 1) Kerr's many failures to make timely monthly payments; 2) the unauthorized sale of GPAC's assets that PNC looked to as collateral; 3) his transfer of the proceeds from GPAC's unauthorized sale of PNC's collateral to his Dollar Bank account in violation of the ARL's term that Kerr must keep all his accounts at PNC; and 4) that Kerr "knowingly submitted material and false financial statements to PNC, which he later acknowledged under oath." *Id.* at 8.

■ ¶ 25 Following our review of the briefs and record, we conclude that the trial court properly, for all the reasons it stated, denied Kerr's petition. A party may open a confessed judgment on the basis of compliance with a later collateral or modified agreement between the parties. *Gettier v. Friday*, 375 Pa. 206, 99 A.2d 899 (1953), *Yezbak v. Croce*, 370 Pa. 263, 88 A.2d 80 (1952). Thus, Kerr could establish a valid basis to open PNC's confessed judgment by demonstrating compliance with the ARL. However, the trial court correctly determined that Kerr failed so to comply.

■ ¶ 26 Primarily, Kerr did not comply with the ARL's requirement to make timely payments. Kerr tries to rely on cases, including *Rusiski v. Pribonic*, 511 Pa. 383, 515 A.2d 507 (1986), that involved contracts to construct new buildings. Those cases do hold that, absent a "time is of the essence" clause, liability will not attach for noncompliance with specified dates.

Clearly, however, a contract to build new buildings differs greatly from business working capital loans. Construction of new buildings uniquely entails many chances for delays based on unknowable future circumstances.

■ ¶ 27 PNC's and Kerr's original loan agreements, and the ARL, instead have straightforward lending and repayment provisions. Under Pennsylvania law "it is firmly settled that the intent of the parties to a written contract is contained in the writing itself." *Krizovensky v. Krizovensky*, 425 Pa.Super. 204, 624 A.2d 638, 642–643 (1993). *Accord Duquesne Light Co. v. Westinghouse Electric Corp.*, 66 F.3d 604, 613 (3rd Cir.1995); *Samuel Rappaport Family Partnership v. Meridian Bank*, 441 Pa.Super. 194, 657 A.2d 17, 21 (1995). The ARL specified a workout payment arrangement for 36 monthly payments of $1,285 each, plus a $6,000 final balloon payment at the end of the three years, for a total due of $52,260. The LSPO provided that PNC would accept, assuming timely payments of all prior monthly installments, the even lesser sum of $41,000, if paid on or before July 31, 1999. Essentially, PNC would accept less money if Kerr and the other Borrower parties paid it at least one year earlier than the ARL's July 31, 2000 full maturity date. The ARL plainly meant that PNC would accept $41,000 only if Borrower made other payments timely and final payment by July 31, 1999.

¶ 28 Kerr argues that, absent a "time is of the essence" clause, he may pay the discounted amount after July 31, 1999. Ultimately, that construction of the ARL means Kerr can pay it whenever he chooses, and gives the Borrower parties no incentive at all to pay the LSPO payment, or any payments, timely. In fact, Kerr and the other Borrower parties made no payments at all between the date of the unau-

thorized asset sale and PNC's notice of default, a period of over one year. We conclude that the trial court correctly ruled that Kerr violated both the original loan agreements and the ARL.

■ ¶ 29 Similarly, the trial court correctly ruled that pendent negotiations between PNC and the Borrower parties did not excuse timely compliance with the ARL. Kerr cites no authority to support his argument that ongoing negotiations excuse *ad interim* noncompliance with contract terms. Kerr obtained no written extension of time, or additional forbearance agreement, in conjunction with the ongoing negotiations. Instead, Kerr argues that he had the unilateral right to stop making payments during the negotiations. Absent an express mutual agreement, a litigant can claim no rights as the result of mere negotiations. *GMH Associates, Inc. v. Prudential Realty Group,* 752 A.2d 889 (Pa.Super.2000). Thus, Kerr's second argument fails also.

■ ¶ 30 Kerr next argues that PNC violated the ARL by failing to give notice of default respecting the July 31, 1999 LSPO deadline. Again, Kerr cites no authority to support his argument. The ARL notice language specifies eight default events. None of those default events involved failure to pay the discounted LSPO by the July 31, 1999 date. Under the ARL's terms, the Borrower parties could continue in timely compliance without exercising the LSPO if they made an additional 12 monthly payments and the final $6000 balloon payment on or before July 31, 2000. The ARL thus did not require PNC to give notice of default if Borrower did not timely exercise the LSPO, since failure to exercise that option was not a default event.

¶ 31 PNC did not declare default on November 15, 1999 because Borrower failed to exercise the LSPO. Rather PNC declared default because Borrower failed to make any payments after November 13, 1998, when it made the unauthorized sale of its assets that PNC looked to as collateral and otherwise committed many other breaches of the ARL and the original loan agreements. We also agree with the trial court that Kerr could not reasonably expect PNC to give Kerr notice that he missed the LSPO discount date at a time *before* he actually missed the LSPO discount date.

■ ¶ 32 Kerr's fourth argument merely restates his first three to the effect that he materially complied with the ARL terms. Given our conclusion that the trial court correctly found that Kerr failed so to comply, we have no need to address Kerr's redundant fourth argument. However, we also conclude that, based on Kerr's replete and repeated noncompliance with the terms of the ARL and the original loan agreements, the trial court correctly found that Kerr did not qualify for equitable relief in the form of his petition to open. Kerr calls his defaults failures to make timely payments, sale without notice of PNC's collateral and abstraction of the sale proceeds, keeping funds at Dollar Bank in violation of the ARL's requirement that he keep all his accounts at PNC bank, and false statements to PNC, simply "irrelevant." Appellant brief at 10. To the contrary, Kerr committed wholesale violations of the terms of the ARL and the original loan agreements. Those violations had substantial relevance and more than the requisite *nexus* to the subject matter of the equitable relief that Kerr seeks. Thus, the trial court properly denied relief based on the "unclean hands" doctrine. Kerr's repeated and comprehensive breaches and bad faith involved his dealings with PNC in a way that "directly affects the relationship subsisting between the parties and is directly connected with

the matter in controversy." *Estate of Pedrick*, 505 Pa. 530, 482 A.2d 215 (1984). *Accord, Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245–246, 54 S.Ct. 146, 78 L.Ed. 293 (1933).

¶ 33 Lastly, Kerr argues that the trial court erred by denying the claim in his petition for an accounting from PNC. Kerr maintains that PNC made several errors in recording payments and in calculating amounts due under the ARL. Also, Kerr contends that PNC sent him letters and statements, within a period of two months from November 1999 to January 2000, that stated widely varying amounts due. Kerr argues that he has the right to have the trial court stay execution until PNC provides an accounting and the court can determine the correct amount due.

■ ¶ 34 The trial court found that Kerr had no right to an accounting at the execution stage. It stated that Kerr *signed the original lending agreements* and the ARL, and that those documents did not require PNC to provide Kerr with an accounting. "Simply put, Kerr agreed to pay the recited amount without requesting an accounting.... PNC's collection actions in pursuing this debt have not prejudiced Kerr." T.C.O., 7/12/01, at 11.

¶ 35 Indeed, the ARL does not require PNC to make any accountings to Kerr. The ARL, however, at its outset reviewed the activities under the five prior loan agreements and stated the amounts then due under each of the five loans. In its November 15, 1999 notice of default, PNC acknowledged making previous errors in posting payments, but the notice of default corrected the errors. The other differences in amounts that PNC demanded in notices, upon review, appear to relate to differences between a) the amount necessary to bring Borrower current on the ARL, b) the total amount Borrower owed under the ARL, and c) the amount Borrower owed on the original loans.

¶ 36 In an equitable proceeding, a party may request an accounting under Pa. R.C.P. 1530. However, that rule does not provide a standard for decision as to when and whether a "party is entitled to an accounting" but seems to leave that determination up to the court in a particular case. *Safway Steel Scaffolds Co. v. Clayton*, 413 Pa. 229, 196 A.2d 378 (1964), required former employees, in a covenant not to compete case, to account to their former employer for profits they made on contracts they obtained after they left. In that case, clearly the former employer did not know how much profit its former employees had made in their new ventures, and the court held that under Rule 1530 the former employer had the right to an accounting. In Kerr's case, however, the trial court correctly stated that he knew how much GPAC had borrowed and how much it had repaid.

¶ 37 Kerr argues that he has the right to an accounting under our holding in *Mellon Bank v. Joseph*, 267 Pa.Super. 307, 406 A.2d 1055 (1979). That case did not involve Rule 1530 requests for an accounting, but instead involved Pa.R.C.P 1029(c)'s standard for required extent of "reasonable investigation" for an answering defendant to make a valid denial based on lack of sufficient knowledge. There we held that a borrower defendant, in filing an answer, did not violate Rule 1029(c) if he did not have precise information about the amount due on a loan. *Joseph* thus does not apply to Kerr's case. None of the other four cases that Kerr cites involve the issue of entitlement to an accounting under Rule 1530, and thus they provide no support for his position. Without more, we conclude that the trial court properly

found that Kerr had not established a right to an accounting.

¶ 38 Order affirmed.